**CHEVRON U.S.A. INC., Plaintiff,**

v.

**Benjamin J. CAYETANO, et al., Defendants.**

**No. Civ. 97–00933 ACK.**

United States District Court, D. Hawaii.

Nov. 10, 1998.

Reginald D. Steer, Robert C. Phelps, Saul D. Bercovitch, Pillsbury Madison & Sutro, San Francisco, CA, Bruce C. Bigelow, Case Bigelow & Lombardi, Honolulu, HI, John R. Myrdal, Jeffrey A. Damasiewicz, Verner Liipfert Bernhard, McPherson and Hand, Honolulu, HI, for plaintiff.

Ted G. Clause, Ted Gamble Clause, Office of the Attorney General—State of Hawaii, Honolulu, HI, for defendants.

Ted G. Clause, (See above), for Margery S. Bronster, Attorney General, of the State of Hawaii, defendant.

### ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

KAY, Chief Judge.

### SYNOPSIS

The Court is mindful of the strongly felt concerns of the legislature that Hawaii's consumers are paying too much for gasoline. However, the Court finds that Act 257 as crafted fails to substantially further this legitimate state interest, and therefore effects an unconstitutional taking.[1] Section 3(c) of Act 257, which limits rents that an oil company may charge its lessee dealers, fails to benefit dealers and consumers for two principal reasons. First, similar to the condominium tenants under the rent control ordinance declared unconstitutional in *Richardson v. City and County of Honolulu,* incumbent dealers are able to capture the value of reduced rent in the form of a premium upon sale of their leaseholds, and consequently, incoming lessee dealers are not benefitted by the Act. 124 F.3d 1150 (9th Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 275, 142 L.Ed.2d 227, 1998 WL 313049 (Oct. 5, 1998), *and cert. denied,* —— U.S. ——, 119 S.Ct. 168, 142 L.Ed.2d 137, 1998 WL 407121 (Oct. 5, 1998).[2] Second, since oil companies can offset rent reductions by increasing wholesale gasoline prices, they can unilaterally negate any benefit to be realized by dealers and consumers.

### BACKGROUND

On June 21, 1997, the Hawaii Legislature, prompted by concerns regarding the

---

1. The Court notes the State of Hawaii has now pursued other means to rectify these concerns by filing suit against gasoline wholesalers in Hawaii, alleging, inter alia, they have engaged in price fixing.

2. The Court notes that Act 257 was enacted before the Ninth Circuit Court issued its decision in *Richardson.*

relatively high price of gasoline charged to Hawaii consumers, enacted Act 257 of the Hawaii Revised Statutes. Act 257, inter alia, implements restrictions on gasoline manufacturers and jobbers in dealing with their retail dealers. Specifically, Section 3(c) of Act 257 ("the Act") restricts the amount of lease rent an oil company may charge a lessee dealer for use of a service station.

In response to the enactment of the Act, Plaintiff Chevron brought suit against Defendants Benjamin J. Cayetano, Governor of the State of Hawaii, and Margery S. Bronster, Attorney General of the State of Hawaii, challenging Section 3 of the Act as effecting an unconstitutional taking of Chevron's property in violation of the Fifth and Fourteenth Amendments of the United States Constitution. Section 3 of the Act reads, in pertinent part:

> (c) All leases as part of a franchise as defined in section 486H–1, existing on August 1, 1997, or entered into thereafter, shall be construed in conformity with the following:
>
> (1) Such renewal [of the lessee-dealer's leasehold] shall not be scheduled more frequently than once every three years; and
>
> (2) Upon renewal (of the leasehold), the lease rent payable shall not exceed fifteen percent of the gross sales, except for gasoline, which shall not exceed fifteen percent of the gross profit of product, excluding all related taxes by the dealer operated retail service station as defined in section 486H–1 and 486H–plus, in the case of a retail service station at a location where the manufacturer or jobber is the lessee and not the owner of the ground lease, a percentage increase equal to any increase which the manufacturer or jobber is required to pay the lessor under the ground lease for the service station. For the purpose of this subsection, "gross amount" means all monetary earnings of the dealer from a dealer operated retail service station after all applicable taxes, excluding income taxes, are paid. The provisions of this subsection shall not apply to any existing contracts that may be in conflict with its provisions.
>
> (d) Nothing in this section shall prohibit a dealer from selling a retail service station in any manner.

Haw.Rev.Stat. § 486H–10.4 (1997).

On January 28, 1998, Plaintiff filed a motion for partial summary judgment on its Second Claim for Relief. On July 30, 1998, Defendants responded and filed a cross motion for summary judgment on all claims in Plaintiff's complaint. On August 19, 1998, and August 28, 1998, Plaintiff and Defendants each filed their respective replies. The Court heard oral arguments on September 8, 1998. Both parties agreed that this case should be decided one way or the other on summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. See Celotex, 477 U.S. at 322, 106 S.Ct. 2548. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." · T.W. Elec. Serv. v. Pacific Elec.

*Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See T.W. Elec. Serv.,* 809 F.2d at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct.

1348). Of course, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *See T.W. Elec. Serv.,* 809 F.2d at 630–31.

## DISCUSSION

### I. *Ripeness*

Initially, the Court must determine whether Plaintiff's takings claim is ripe. As the Ninth Circuit noted in *Richardson,* there are two hurdles to a regulatory taking claim brought in federal court:

> The first hurdle, ... that the plaintiff obtain a final decision regarding the application of the regulation to the property at issue from the entity charged with implementing the regulation ... does not apply to facial regulatory takings claims.... The first hurdle thus does not apply to [Plaintiff's] argument.

> The second hurdle stems from the Fifth Amendment's proviso that only takings without 'just compensation' infringe that Amendment; 'if a State provides adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation clause until it has used the procedure and been · denied just compensation.'

*Richardson,* 124 F.3d at 1165. Because Chevron's argument that Act 257 does not substantially advance a legitimate state interest does not depend upon the extent to which Chevron is compensated, its facial regulatory taking claim is ripe.

### II. *The Takings Clause*

The Takings Clause of the Fifth Amendment of the United States Constitution states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amend. V. The United States Supreme Court has consistently distinguished "physical takings" from "regulatory takings." A physical taking occurs when a governmental entity authorizes a permanent physical occupa-

tion of real property. *See Yee v. City of Escondido*, 503 U.S. 519, 535, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). By contrast, the regulatory taking issue typically arises when a government regulation, such as a zoning regulation or a rent control law, affects a property owner's ability to use his land. *See id.* In the words of Justice Holmes, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

■ The Court notes that it is well established that legislative acts come to the Court with a presumption of constitutionality, *see Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 637, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 83–84, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), and therefore Plaintiff faces an uphill battle in its challenge to Act 257.

### A. *Facial Challenge*

When a party alleges that an act of the legislature effects an unconstitutional taking, they may bring either a "facial" challenge or an "as applied" challenge. The Supreme Court has repeatedly held that a land use regulation will be found to effect a taking if it does not substantially advance a legitimate state interest or denies the landowner economically viable use of his land. *See Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *see also, Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1016, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

The relevant inquiry in a facial challenge is whether "mere enactment" of the challenged regulation effects a taking. *See Agins*, 447 U.S. at 260, 100 S.Ct. 2138. For example, in *Agins*, the city of Tiburon adopted zoning ordinances that limited development of appellant's five-acre lot to a maximum of five single-family residences. Appellants brought suit against the city, alleging that the ordinances prohibited all development of their land and thus effected a taking of their property. The California Supreme Court rejected appellants' request for a declaration that the zoning ordinances were facially unconstitutional, holding that the terms of the challenged ordinances allowed the appellants to construct between one and five residences on their property. *See id.* at 262, 100 S.Ct. 2138.

The Supreme Court granted certiorari, and held that the ordinances substantially advanced legitimate governmental goals. *See id.* at 261, 100 S.Ct. 2138. In reaching this decision, the Court considered the benefits of the ordinances as well as any diminution in market value that the appellants might suffer. The Court also considered appellants' allegations that they wished to develop the land for residential purposes, that the land was the most expensive suburban property in the State, and that the best possible use of the land was residential, and held that although the ordinances limited development, they neither prevented the best use of appellants' land or extinguished a fundamental attribute of ownership. The Court further held that the general plan advanced a legitimate state interest—protection from urbanization. Finally, the Court noted that the ordinance did not impose a burden solely on one landowner, it affected development generally, and therefore the public did not benefit at the expense of a few. *See id.*

Similarly, in *Richardson*, the plaintiff brought a facial challenge to a rent control ordinance that placed a cap on renegotiated ground rent that could be charged by

the owner of the land under condominium units. *See* 124 F.3d at 1163. The Ninth Circuit first considered the typical condominium ground lease scheme, noting that since the land underneath condominiums is ordinarily owned by someone other than the condominium owner-occupant, the condominium owner must lease the ground underneath the unit for long periods. The court went on to find that although these leases are initially fixed for a term of years, the rent is subject to renegotiation which typically is based on a percentage of the fair market value of the land appurtenant to the unit, exclusive of improvements, as of the date of the renegotiation. Finally, the court recognized that the ordinance at issue was enacted because the rapid rise in Hawaiian land prices often resulted in renegotiated rents several hundred times greater than the initial fixed rent. Nonetheless, the Ninth Circuit declared the ordinance facially invalid, holding that the absence of a mechanism to prevent owner-occupants from capturing a premium upon the resale of their unit meant that the ordinance would not substantially further its goal of creating affordable housing. *See id.* at 1166.

In the instant case, Plaintiff brings a facial challenge to Act 257, arguing that the rent cap provision of the Act effects an unconstitutional taking because it fails to substantially advance a legitimate state interest and it leaves Plaintiff with no economically viable use of its land.

### B. *Applicable Standard in Regulatory Takings Analysis*

Defendants argue that Act 257 does not effect a taking, and is therefore constitutional. Moreover, Defendants claim that Plaintiff is applying the wrong standard in evaluating the state interest portion of the takings analysis.

According to Defendants, in order for the Act to pass constitutional muster, it is not necessary that the Act *actually* further the state interest involved, but merely that the Legislature rationally could have

believed that the Act would do so. In support of this argument, Defendants cite *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). However, *Midkiff* dealt with a physical taking, rather than a regulatory taking, and is thus distinguishable from the present case. *See id.* at 233, 104 S.Ct. 2321. In the physical taking context, the government exercises its eminent domain power to take private property for "public use." Furthermore, once the government decides to physically take property, it must provide just compensation to the person from whom the property was taken. At issue in *Midkiff* was the propriety of the purported "public use" advanced by the government to justify the taking. *See id.* at 235, 104 S.Ct. 2321. The *Midkiff* Court held that the only requirement in a physical taking, since the taking is fully compensated, is that the legislature "rationally could have believed" the taking would serve the purported "public use." *See id.* at 242.

By contrast, the present case deals not with a physical taking, but with whether there has been a *regulatory* taking, an inquiry which requires a different analysis. In the regulatory taking context, the inquiry is not whether property has been taken for a public use, but rather, whether or not a government regulation substantially advances a legitimate state interest. As clarified in *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1986), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988):

> In [*Midkiff*], the Court explored the meaning of the public use requirement in the Fifth Amendment's eminent domain clause.... The Court in *Midkiff* did not address the somewhat different articulation of the standard applicable in cases where there was no deliberate exercise of the eminent domain power. For example, it did not mention *Agins v. City of Tiburon* where it had noted that "the application of a general zoning law to a particular property effects a taking

if the ordinance does not substantially advance legitimate state interests...." The *Midkiff* Court left open the possibility that less deference would be afforded where government does not intend to effect a taking than where it does.... It makes considerable sense to give greater deference to the legislature where it deliberately resorts to its eminent domain power than where it may have stumbled into exercising it through actions that incidentally result in a taking.

*Id.* at 1280. The United States Supreme Court echoed this viewpoint in *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 835, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), when it stated:

> We have required that the regulation [in the takings context] "substantially advance" the "legitimate state interest" sought to be achieved, not that "the state could rationally have decided" that the measure adopted might achieve the State's objective.

*Id.* Finally, the Ninth Circuit's opinion in *Richardson,* a case discussed by both parties in the instant case, further clarified this concept:

> The language used throughout *Midkiff* indicates that deference to the legislative body's public use determination is required when the taking is fully compensated.... [W]e believe that Nollan–Lucas–Dolan trio does not signal a change from this longstanding rule of deference because we see nothing inconsistent in applying heightened scrutiny when the taking is uncompensated, and a more deferential standard when the taking is fully compensated.

124 F.3d at 1158. Thus, the Court finds that, in order to determine whether the Act effects a taking, the appropriate inquiry is whether the Act substantially advances a legitimate state interest, not merely whether the legislature rationally believed it would do so.

## C. *Advancement of a Legitimate State Interest*

The United States Supreme Court has not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between a regulation and the state interest satisfies the requirement that the former "substantially advance" the latter. *Nollan,* 483 U.S. at 834, 107 S.Ct. 3141. However, the Court has made clear that a broad range of governmental purposes and regulations satisfies these requirements. *See id.*

### 1. *State Interests to be Advanced*

Before determining whether a legitimate state interest is advanced by the Act, it is necessary to ascertain the specific state interests involved. Plaintiff argues that the purpose of Act 257 is to provide protection for service station lessee dealers. Defendants, however, assert that Act 257 is designed to protect consumers from the harmful effects of the highly concentrated petroleum market in Hawaii.

Defendants' contention is not without merit, for on its face, Act 257 appears to be directed toward the protection of consumers. Section 1 of Act 257 reads, in pertinent part:

> (1) The petroleum industry is an essential element of Hawaii's economy and is therefore of vital importance to the health and welfare of all people in the State of Hawaii; ...

> (4) Because Hawaii is a physically small and geographically remote economy, certain of its markets tend to be concentrated. Market concentration is a function of the number of firms in the market and their respective market shares. In a highly concentrated market, market prices tend to rise above competitive levels. *Market prices persistently above competitive levels are harmful to consumers and the public.* Barriers to competition tend to cause supracompetitive prices to persist; and

(5) The markets for oil and oil products in Hawaii are highly concentrated markets.

Haw.Rev.Stat. § 257 (1997) (emphasis added).

However, a closer examination of Act 257, specifically its legislative history, reveals another interest, namely "to provide certain protection for dealer operated retail service stations." Conf.Comm.Rep. 38, H.B. No. 1451 (1997).

While these two interests appear to be distinct from one another, they do not conflict. A thorough analysis of Defendants' argument reveals that in order to further the state's interest of protecting consumers, it is first necessary to help lessee dealers, whose viability might lead to a less concentrated—and thus more consumer friendly—market. Thus, the Court finds that while the legislature was mindful of the need to protect lessee dealers, this consideration was essentially a step toward the ultimate goal of reducing gasoline prices for Hawaii's consumers.[3] Having ascertained the state interests to be advanced by Act 257, the Court's next task is to determine whether or not these interests are substantially advanced.

### 2. *Advancement of State Interests*

In support of its motion for partial summary judgment, Plaintiff argues that the Act fails to substantially advance a legitimate state interest. The Court agrees with Plaintiff, on two principal grounds.

### a. *New Dealers are Not Protected Because Incumbent Dealers Can Capture the Value of the Reduced Rent in the Form of a Premium*

Defendants argue that the savings realized from reduced rent under the Act will lead to the continued business viability of independent dealers, keeping them in the market. They further argue that this, in turn, will lead to a less concentrated market, giving consumers more choices and lowering retail prices by way of increased competition.

Plaintiff argues, and the Court agrees, that the rent cap provision of the Act fails to protect new lessee dealers because it allows incumbent dealers to capture the value of the decreased rent in the form of a premium. The existence of the rent cap makes an independent dealer's leasehold interest in a service station more valuable, and this added value becomes especially significant when an incumbent dealer undertakes to sell his interest. *See* Stipulation of Facts, ¶¶ 34, 35 at 10–11. Since the Act does not prohibit an incumbent dealer from selling his or her service station lease, the rent cap provision enables these dealers to sell their stations at a premium. *See id.* at ¶¶ 28, 29. Because the dealer to whom the interest is transferred will be required to pay the premium, the overall expense incurred by the incoming lessee dealer remains the same, and as a result, there are no savings to pass along to consumers.

In support of this argument, the Court finds *Richardson,* 124 F.3d at 1150, controlling. In *Richardson,* the Ninth Circuit addressed a rent control ordinance that placed a cap on renegotiated ground rent that could be charged by the owner of the land under condominium units. The ordinance was enacted for the purpose of providing affordable housing to owner-occupants. *Id.* at 1165. The trustees of the Bishop Estate, owner of the fee simple title to the land underneath condominiums that were affected by the ordinance, brought an action contesting the constitutionality of the ordinance. Since the own-

---

**3.** Even if the ultimate goal of the legislature was to help lessee dealers, Act 257 would still fail to substantially advance its purpose. As discussed below, incumbent lessee dealers can capture the value of the reduced rent in the form of a premium, thereby depriving incoming lessee dealers of the benefit of the rent cap. Similarly, oil companies can offset any decrease in rent with an increase in wholesale prices, and thereby eliminate the benefit to the lessee dealer.

er-occupant of a condominium was free to transfer his or her "rent-controlled" leasehold interest, the owner-occupant was able to capture the value of that rent cap in the form of a premium. *Id.* at 1164. The ordinance was challenged by the plaintiff as an unconstitutional taking.

The Ninth Circuit affirmed the district court's finding that the ordinance effected a regulatory taking. According to the Ninth Circuit, since the ordinance did not provide a mechanism to prevent the lessees from capturing the premium, the state interest in providing affordable housing was not substantially advanced, as ultimately the price of housing would remain the same. *Id.* at 1166.

Like *Richardson*, the possibility of a sales premium in the case at bar prevents the state interests from being substantially advanced. Act 257 fails to provide a mechanism to prevent dealers from capturing a premium. Indeed, cases like *Yee* and *Hall* suggest that it is inappropriate, if not unconstitutional, to fail to provide a mechanism in rent control legislation to preclude the capture of a premium. *See Yee*, 503 U.S. at 527–31, 112 S.Ct. 1522; *Hall*, 833 F.2d at 1279–80. Moreover, the potential for a premium in the present case is even more compelling than that in *Richardson*, since it is likely that a lessee dealer will find it easier to part with his or her business, than would a homeowner with his or her home. Presumably, a homeowner wishes to remain where he or she lives, whereas a businessperson is likely to view maximization of profits as the ultimate business goal. Thus, because an independent dealer can unilaterally negate any benefit a transferee might receive from the Act, it fails to substantially advance the state's interest in protecting new dealers.

Defendants argue that *Richardson* is distinguishable from the present case because the purpose of Ordinance 91–96, which was at issue in *Richardson*, and the purpose of Act 257 are distinct. The primary goal of Ordinance 91–96 was to provide affordable housing for owner-occu-

pants of condominiums subject to ground leases. The "Findings and Purpose" section of Ordinance 91–96 states, in relevant part:

> The council finds that:
>
> \*   \*   \*   \*   \*   \*
>
> (3) ... owner-occupants of condominium[s] ... were not informed ... of lease rent renegotiation ... terms ... of the lease, [which are] established unilaterally by the lessors....;
>
> (5) ... Unless controlled, the renegotiated lease rents may be unaffordable to many owner-occupants of leased condominium housing units ...;
>
> (6) ... owner-occupants may have no recourse but to terminate their leases or sell ... and seek housing elsewhere ...;
>
> (7)(E) Residential leaseholds have also undesirable social effects ... [because] as the lessee advances in age, [the] lessee's income potential declines, ... causing the lessee to give up the lease ...;
>
> \*   \*   \*   \*   \*   \*
>
> The council further finds and declares:
>
> \*   \*   \*   \*   \*   \*
>
> (3) ... lease rent increases of 1,000 percent would make home ownership unaffordable to a substantial number of owner-occupants of residential condominiums....

Honolulu City and County, Haw. Ordinance 91–96 § 1. Defendants argue that unlike the ordinance at issue in *Richardson*, which was enacted to provide affordable housing, the purpose of Act 257 is not to provide affordable gas station purchases, but rather, to benefit consumers. Thus, even if transferee dealers are negatively impacted by a premium, according to Defendants, incumbent dealers will still benefit from the rent cap and will thus pass along their savings to consumers, who will thereby benefit as well. The Court disagrees.

First of all, in *Richardson*, although the owner-occupants who retained their condo-

miniums would clearly receive a direct benefit from the rent cap each month, the Ninth Circuit nonetheless declared the Ordinance unconstitutional because it failed to prevent owners of condominiums from capturing a premium upon the sale of their units, thereby depriving the purchasers of any benefit from the rent cap and resulting in the price of housing ultimately remaining the same. Moreover, while it is possible that some lessee dealers may benefit from the Act's rent cap in the form of lower overall costs, there is no reason to conclude that such dealers will react to this savings by lowering their retail prices. Dealers may instead elect to maintain a higher profit margin, since the Act includes no mechanism to prevent lessee dealers from simply keeping their prices the same and retaining the profit from the reduced rent on a month-to-month basis. Nothing has been presented to the contrary.[4]

4. The parties agree that under current conditions, Act 257's rent cap will only affect 11 of Chevron's 64 lessee dealer stations in Hawaii. *See* Stipulation of Facts, ¶ 6 at 4. Thus, less than 20 percent of Chevron's stations will be impacted by the rent cap. No evidence has been presented as to how the Act affects the remaining non-Chevron stations.

The Court nonetheless finds that Act 257 fails to substantially advance a legitimate state interest, because it is probable that consumers will not benefit from the rent cap as applied to these remaining stations. First, it is possible that, like 53 of Chevron's lessee dealer stations, the Act will not impact these other stations at all. If this is the case, then the Act will certainly not benefit consumers, since prices at these stations will remain unchanged. Second, even if the Act were to impact these stations, there is no mechanism to prevent incumbent dealers from capturing a premium upon the sale of their stations, as discussed at length above. Therefore, under either scenario, Act 257 does not substantially advance the state's interest in benefitting consumers.

Furthermore, even in the absence of a captured premium, the Act still fails to advance its purpose. As discussed infra, and as acknowledged by the government, Chevron can merely offset the decreased rent by increasing their gasoline prices, thereby negating any benefit to be achieved by the Act. The Court finds no reason why other oil companies

### b. *Incumbent Dealers Are Not Protected Because Rent Reductions Can Be Offset By Wholesale Price Increases*

Defendants also argue that since the rent cap provision of the Act helps incumbent dealers to maintain their viability, the market will be less concentrated, giving the consumer more choices. They go on to argue that this lowered concentration means more competition and thus lower retail prices. The Court finds it unlikely that the Act will lead to such a result.

There is no dispute that Plaintiff receives income from dealers in the form of both rent and fuel sales. Importantly, the Act does not place any limitation on the price of fuel sales. Thus, an oil company can raise fuel prices to compensate for the reduction in rent, and as a result, dealers will not receive any benefit from the rent cap.[5]

would not act likewise. In light of these considerations, it is highly unlikely that the minimal number of dealers who might be benefitted by the Act would make a competitive impact if they were to lower their prices.

Finally, the fact that Act 257 allows Chevron to charge approximately $1.1 million more than it would otherwise have charged under its own rental program further demonstrates the Act's ineffectiveness in its purpose of protecting consumers. *See* Stipulation of Facts, Table 1.

5. In fact, Defendants have acknowledged this possibility in their brief. Defendants' brief reads, in relevant part:

In contrast, Chevron's lessee dealer gas stations provide Chevron with two sources of revenue. Chevron uses both to pay the expenses it incurs in leasing the service stations. The first source is the contract rent that is subject to Act 257. The second source of revenue is from the sale of Chevron gasoline to lessee dealers which lessees are required to purchase from Chevron under the supply agreement Chevron-requires of the dealer lessees. The revenue which Chevron receives from its gasoline sales is substantially greater than the contract rent. Act 257 does not impose a cap on the amount Chevron may charge for gasoline and other products it sells its lessee dealers.

Defendants argue that although oil companies are free to raise fuel prices to offset any reduction in rent, they will not do so.[6] Defendants' expert states that an increase in wholesale fuel prices by an oil company would lead the dealer to increase his retail fuel prices. This increased retail price, according to Defendants, would result in a decreased volume of fuel sales, which would ultimately hurt the oil company. However, Defendants' expert fails to explain why the oil company would not increase the wholesale price to simply offset the decrease in rent.[7] Indeed, there is no economic reason why a shift from paying a certain sum as "rent" to paying that same sum as "fuel price" would lead a dealer to react by raising his gas prices when his overall costs remain the same. By doing so, he would be acting against his own interest, running the risk of decreased sales because of the increased prices. Instead, it is likely that if a dealer's overall costs remain the same, he will choose to remain competitive by keeping his retail prices the same. Because oil companies can simply raise their wholesale prices to the same extent that rent decreases, the dealer is likely to be unaffected by the rent cap, and gas prices will remain unchanged.[8] Consequently, the Act's purpose of protecting the dealer—and thereby protecting the consumer—would not be met.

Since Chevron's Dealer Supply Contract allows a lessee dealer to purchase fuel from suppliers other than Chevron, one might argue that if Chevron were to offset the decreased rent as described above, a dealer would simply "go elsewhere" to purchase his fuel. However, the Court finds that this is neither a feasible nor practical alternative. First, the terms of the Dealer Supply Contract state that a lessee dealer must purchase from Chevron all fuel that is necessary to fulfill customer demand for Chevron gasoline. Thus, even if a dealer wishes to discontinue Chevron gasoline and sell another brand, he may not do so if a demand for Chevron gasoline exists. Second, according to the Dealer Lease, if a lessee dealer chooses to market and sell other gasoline, he must install his own pumps and tanks, and he must make it clear to consumers that the fuel contained therein is not Chevron fuel. As stipulated to by the parties, there are only two local refinery sources: Chevron, which supplies sixty percent of the gasoline produced or refined in Hawaii, and Tesoro, which supplies forty percent. *See* Stipulation of Facts, ¶ 38 at 11. Therefore, if a dealer

---

Therefore, Act 257 does not deprive Chevron of the ability to increase the DTW price, Chevron's primary revenue stream from its lessee stations, in the event of an increase in costs.
*See* Def.'s Mot. for Summ.J., p. 28–29 (citations omitted).

6. Plaintiff's expert disagrees. It is evident from Plaintiff's expert's declaration that this can and will occur in response to a reduction in rent. *See* Declaration of John R. Umbeck, p. 3, ¶ 5(b); p. 8, ¶ 16; p. 11, ¶ 21. According to Plaintiff's expert, Act 257 will (1) penalize Chevron and its lessee dealers, reducing their viability in Hawaii; (2) penalize consumers because it can be expected to lead to higher retail gasoline prices; (3) not benefit future lessee dealers because dealers can capture the value of the rent cap in the form of a premium; and (4) not permit Chevron to earn a reasonable return on its investments. *See id.* at p. 3, ¶ 5. By contrast, Defendants' expert claims that Act 257 will (1) benefit consumers

by decreasing the concentration in the gasoline market; (2) benefit both incumbent and transferee dealers; and (3) provide Chevron a reasonable return on its investment. *See* Declaration of Keith B. Leffler, p. 4–5, ¶ 7.

7. Neither Defendants nor Defendants' expert have offered any reason why this is not a feasible, and even likely, result.

8. Although Defendants might argue that an oil company may not be able to accurately assess the amount of increase in wholesale price needed to offset the decrease in rental income, the parties agree that, where an economic benefit or loss is difficult to quantify, on average, the participants will estimate accurately. *See Declaration of Keith B. Leffler*, p. 11–12, ¶ 16 (discussing accuracy of estimating value of rent cap in order to calculate premium); *Declaration of John R. Umbeck*, p. 12, ¶ 22; p. 13, ¶ 24 (discussing estimation of rent cap value).

chose to obtain gasoline from another source, it would be cost-prohibitive without some sort of "concerted action," since importing gasoline requires purchasing a large quantity and chartering a vessel to transport it. Because this is not a realistic alternative, the Court finds that a lessee dealer's mere ability to purchase fuel from other sources does not negate the probability that an oil company such as Chevron and Tesoro could be successful in defeating the rent cap by offsetting decreased rent with increased fuel prices.

For all of the reasons outlined above, the Court finds that Section 3(c) of Act 257 fails to substantially advance a legitimate state interest, and as such, effects an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the Constitution.[9],[10]

### III. *Other Claims*

Plaintiff moved for partial summary judgment only on its Second Claim for Relief, while Defendants moved for summary judgment on all claims. Defendants failed to satisfy their burden on Plaintiff's First, Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief, because they did not present any evidence which demonstrates that there is no genuine issue of material fact as to those claims. This is particularly true with regard to Plaintiff's First Claim for Relief (Deprivation of Constitutional Rights in Violation of 42 U.S.C. § 1983) and Fifth Claim for Relief (impermissible taking in violation of the Hawaii Constitution), inasmuch as the Court finds that Act 257 effects an unconstitutional

taking. Accordingly, summary judgment on those claims is DENIED.

In their brief, Defendants represented that Plaintiff "announced" that it would not pursue its due process and equal protection claims. However, the Court does not find anything in the record which indicates that Plaintiff abandoned these claims. If it can be established that Plaintiff did make such a withdrawal, Defendants are entitled to summary judgment on the Third, Fourth, Sixth, and Seventh Claims for Relief.

### *CONCLUSION*

The Court finds that Act 257 fails to substantially advance a legitimate state interest, and as such, effects an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution. For the foregoing reasons, the Court hereby GRANTS Plaintiff's motion for summary judgment on its Second Claim for Relief.

IT IS SO ORDERED.

---

**9.** While the Court recognizes that Plaintiff brings a facial challenge to Act 257, the Court notes that Act 257 has been in operation since June of 1997, and yet the state claims in its lawsuit filed on October 1, 1998, which alleges antitrust violations, that the price of gasoline for consumers is an average of $.30 per gallon higher than prices on the mainland. This further illustrates the ineffectiveness of Act 257 in its purpose of benefitting consumers. However, the Court has not considered the foregoing in reaching its decision.

**10.** Plaintiff also challenges the Act as effecting an unconstitutional taking on two alternate grounds: (1) that it leaves them with no economically viable use of their land, and (2) that the Act fails to provide for individualized consideration. Because the Court finds that the Act fails to substantially advance a legitimate state interest, it need not address these alternate arguments.