**CHEVRON U.S.A., INC., a Pennsylvania corporation, Plaintiff,**

v.

**Benjamin J. CAYETANO, Governor of the State of Hawaii; Earl I. Anzai, Attorney General of the State of Hawaii, Defendants.**

**CIVIL NO. 97–00933 SOM.**

United States District Court, D. Hawai'i.

April 1, 2002.

Robert A. Mittelstaedt, Pillsbury Winthrop LLP, San Francisco, CA, John R.

Myrdal, Stanton Clay Chapman Crumpton & Iwamura, Honolulu, HI, for plaintiff.

Charles A. Price, James Koshiba, Koshiba Agena & Kubota, Honolulu, HI, for defendants.

### AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MOLLWAY, District Judge.

## I. INTRODUCTION.

This case is a challenge to a state law that caps the rent an oil company may charge someone who leases a service station owned by the oil company. Plaintiff Chevron U.S.A., Inc. ("Chevron"), argues that Act 257, passed by the Hawaii legislature in 1997, unconstitutionally effects a regulatory taking because it fails to substantially further a legitimate state interest. The rent cap was instituted as part of the State of Hawaii's response to high gasoline prices. High prices caused the State of Hawaii to file a separate lawsuit, alleging that oil companies had conspired to keep the prices high. While the parties to the antitrust lawsuit reached a settlement, the present rent cap dispute went to trial. The court held a one-day bench trial on February 26, 2002, then ordered evidence reopened and received limited additional testimony on March 25, 2002. Having examined the evidence provided by economists, who were the only witnesses at trial, this court agrees with Chevron that the rent cap in Act 257 is unconstitutional.

This case has had a long history. Filed in 1997, this case was initially assigned to a different district judge, who granted summary judgment for Chevron on the grounds that Act 257 failed to substantially advance a legitimate state interest and therefore effected an unconstitutional tak-

ing. See Chevron U.S.A., Inc. v. Cayetano, 57 F.Supp.2d 1003 (D.Haw.1998). Defendants (collectively "the State") appealed that decision to the Ninth Circuit in Chevron U.S.A., Inc. v. Cayetano, 224 F.3d 1030 (9th Cir.2000)("Chevron Appeal"). The Ninth Circuit reversed, holding that there were genuine issues of material fact as to whether Act 257 effected an unconstitutional taking by failing to substantially advance its purpose of lowering gasoline prices for consumers. See id. at 1038–1041. The Ninth Circuit remanded the case for resolution of questions of fact, including: (1) whether oil companies would offset the benefits of Act 257 by raising the wholesale price of gasoline, and (2) whether incumbent lessee-dealers would sell their leaseholds at a premium representing the increased value resulting from the rent cap, so that new dealers who had to pay that premium would receive no net benefit from the rent cap to pass on to consumers. Id. at 1042.

Based on the evidence presented at the trial held on February 26, 2002, this court[1] finds that Act 257 will not decrease retail gasoline prices. In fact, it will cause retail gasoline prices to increase. Act 257 will also discourage oil companies from investing in lessee-dealer stations. It will create no incentive for lessee-dealers to continue operating their stations through lower operating costs. Instead, Act 257 will create a premium that lessee-dealers can recognize upon selling their leases. Act 257 will not advance the goal of lowering gasoline prices.

## II. FINDINGS OF FACT.

Whenever, in the following discussion, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's state-

---

1. Following remand, a new circumstance arose that required the original district judge to recuse himself. The case was reassigned to the present district judge.

ments shall have the effect they would have had if properly designated.

This bench trial was conducted in accordance with this court's trial procedures for civil nonjury trials, which are reproduced, in substantially the same form followed here, in Appendix A to this court's decision in *Kuntz v. Sea Eagle Diving Adventures Corp.*, 199 F.R.D. 665 (D.Haw.2001). The court heard testimony from two expert witnesses: John Umbeck, Ph.D. ("Prof.Umbeck"), who testified on behalf of Chevron, and Keith Leffler, Ph.D. ("Prof.Leffler"), who testified on behalf of the State. Direct examinations of both witnesses were submitted to this court in the form of written declarations. Both witnesses appeared live for cross-examination and redirect examination. The court admitted into evidence three exhibits: Defendant's Ex. 1 (Prof. Leffler's direct testimony by declaration), Plaintiff's Ex. 14 (Prof. Umbeck's direct testimony by declaration), and Plaintiff's Ex. 15 (pages A2–A5 of Exhibit A attached to the Stipulation Re: Adoption of Stipulation of Facts for Trial, filed Feb. 22, 2002).

For ease of reference by the parties and the court, the following findings are presented in numbered paragraphs.

*Background.*

1. On June 21, 1997, the State of Hawaii enacted Act 257. Stip. of Facts ¶ 1. Act 257 regulates the maximum rent an oil company may charge a dealer that leases a service station from the oil company. The rent is capped at 15 percent of the dealer's gross margin on actual gasoline sales. Haw.Rev.Stat. § 486H–10.4(c)(2) (1998). Act 257 does not apply to any dealer lease in effect on August 1, 1997. Stip. of Facts ¶ 40.

2. In passing Act 257, the legislature was concerned about the level of concentration at the wholesale level in the gasoline industry. Trial Testimony by Keith Leffler, Tr. at 89:7–14, 96:18–24. The legislature passed Act 257 to reduce gasoline prices for Hawaii's consumers. *See Chevron Appeal,* 224 F.3d at 1033 n. 3.

3. Hawaii's gasoline market is an oligopoly at the wholesale level but very competitive at the retail level. An oligopoly is a market with few sellers. Decl. of Keith Leffler (Ex. 1) ¶ 9. A competitive market, by contrast, is one with many sellers. Decl. of Keith Leffler (Ex. 1) ¶ 9.

4. In a competitive market, no one seller is individually significant enough to have a measurable impact on the industry supply. Sellers therefore act independently of each other. A market with only a few sellers is a "highly concentrated" market. In such a market, each seller recognizes that its decisions will significantly affect the market and its competitors. Each seller therefore takes into account how its competitors will react to its decisions about marketing, supply, and price. The sellers are interdependent, rather than independent, competitors. Reduced competition is likely when the market is highly concentrated. In an oligopoly, an individual firm pursuing its own individual interests will not "rock the boat" and will try to avoid price wars and battles for market share. High concentration may have the anticompetitive effect of causing what few firms there are to cooperate tacitly, resulting in high prices to consumers. Decl. of Keith Leffler (Ex. 1) ¶ 10.

5. The level of concentration in an industry may be measured by the Herfindahl Hirschman Index, or HHI. The HHI is calculated by adding the squared values of the market shares of each company in the industry. Trial Testimony by Keith Leffler, Tr. at 90:22–91:1. If the HHI in a market exceeds 1,800, that market is considered highly concentrated. Trial Testimony by Keith Leffler, Tr. at 91:6–9. The HHI is used by the Department of Justice and the Federal Trade Commission,

among others, to measure concentration levels. Trial Testimony by Keith Leffler, Tr. at 89:18–21.

6. In 1997, Hawaii had two refineries that supplied gasoline to essentially six wholesalers. Decl. of Keith Leffler (Ex. 1) ¶ 9. With an HHI greater than 1,800, the wholesale gasoline market in Hawaii is highly concentrated. Trial Testimony by Keith Leffler, Tr. at 91:10–12.

7. Hawaii's retail gasoline stations come in three types: company-operated stations, which are owned and operated by oil companies marketing their own products; lessee-dealer stations, which are leased by retail dealers from oil companies; and independent stations, sometimes called "two-party dealers" or "open dealers," which are stations that are neither owned by nor leased from oil companies and that make their own decisions about whose gasoline they will buy. Decl. of John Umbeck (Ex. 14) ¶ 6. Company-operated stations tend to enjoy more efficiencies than lessee-dealer stations. On average, when the gasoline price charged to the dealers (the "Dealer Tank Wagon price" or "DTW") is held constant, company-operated stations charge less for gasoline than other stations. Trial Testimony by Keith Leffler, Tr. at 111:5–16.

8. With an HHI of around 150, the retail gasoline market in Hawaii is very unconcentrated, or highly competitive. Trial Testimony by Keith Leffler, Tr. at 96:7–17. To calculate the HHI at the retail level, Prof. Leffler, testifying for the State, grouped together all stations operated by a single oil company, counting them as a single entity deciding on retail prices as a unit. Stations operated by lessee-dealers and open dealers were counted individually, on the theory that such stations decided on retail prices independently. Trial Testimony by Keith Leffler, Tr. at 95:6–9.

9. Under Chevron's lessee-dealer arrangement, Chevron purchases land or leases it from a third party, makes the entire investment to build the service station and to build the related facilities on each location, and leases the land and facilities to the dealer on a turn-key basis. Stip. of Facts ¶ 7. Chevron incurs ongoing expenses attributable to the lessee-dealer rental property, such as ground lease rents, real property taxes, ordinary maintenance (subject to the terms and conditions of the dealer lease), and the accounting expense entry of "depreciation." Stip. of Facts ¶ 8.

10. Chevron's lessee-dealer arrangements have two parts. There is a lease under which Chevron charges the lessee-dealer a monthly lease rent. There is a separate supply contract under which Chevron sells motor fuels to the lessee-dealer at a price unilaterally determined by Chevron. Chevron does not enter into a dealer lease unless the dealer simultaneously executes a supply contract with Chevron. Stip. of Facts ¶ 9. In other words, Chevron requires each lessee-dealer to market Chevron-branded gasoline purchased directly from Chevron as a condition of Chevron's entering into a lease with the dealer. Stip. of Facts ¶ 15. Although any dealer that installs its own pumps and tanks is legally free to purchase non-Chevron gasoline, each Chevron lessee-dealer in Hawaii currently obtains (and has obtained for at least the last 10 years) its supply of gasoline exclusively from Chevron. Stip. of Facts ¶ 16.

11. Effective January 1, 1997, Chevron implemented a new nationwide dealer rental program that restructured the manner in which Chevron calculated rents paid under service station leases. Stip. of Facts ¶ 2. Chevron's dealer leases run for three-year terms. The exception is that, if Chevron is leasing land for a particular

service station from another party under a ground lease that expires in less than three years, the dealer lease expires when the ground lease expires. Stip. of Facts ¶ 24.

12. The lease rent cap provisions contained in Act 257 prohibit complete implementation in Hawaii of the rent rates specified in Chevron's new dealer rental program. Stip. of Facts ¶ 3. Absent Act 257, Chevron would have charged "motor fuel facilities rent" that would have been a percentage of the dealer's gross margin on motor fuel sales (total motor fuel sales volume multiplied by weighted average per gallon margin). Chevron's new rental program had three different percentage brackets applied on an incremental basis to the monthly gross margin on fuel. The rent would have been 18 percent on the portion up to $18,000; 32 percent on the portion between $18,000 and $28,000; and 38 percent on the portion over $28,000. However, Act 257 does not allow Chevron to charge the "motor fuel facilities" rent that it otherwise would have charged. Stip. of Facts ¶ 4. The rental provisions of Act 257 also cause Chevron to require that dealers account for automotive service bay sales, which it otherwise would not do. Stip. of Facts ¶ 6. Act 257 has no direct impact on non-motor fuel facilities rent under Chevron's rental program because the 15 percent cap is greater than what Chevron would have otherwise charged as non-motor fuel facilities rent without Act 257. Stip. of Facts ¶ 4.

13. Chevron estimates that, after all lessee-dealer agreements in Hawaii are renewed under Act 257, the Act will preclude Chevron from charging the rent it other-wise would have charged for 11 of Chevron's 64 lessee-dealer stations in Hawaii. Stip. of Facts ¶ 5; *see also* Table 1, attached to Stip. of Facts.[2]

14. Chevron has invested more than $58,000,000 in its current lessee-dealer service stations and related facilities in Hawaii. The present book value of those same service stations and related facilities is more than $37,000,000. Stip. of Facts ¶ 10. The maximum amount of rent Chevron projects it could receive under the statutory scheme imposed by Act 257, when applied to all Chevron dealer leases in Hawaii, is $6,126,646 for the 12–month period from January 1, 1998, through December 31, 1998. Stip. of Facts ¶ 12. Chevron's projected expenses during the 12–month period from January 1, 1998, to December 31, 1998, for its lessee-dealer stations in Hawaii, i.e., ground lease rents, real property taxes, ordinary maintenance, depreciation, and other direct station expenses, total $6,292,855, exceeding Chevron's projected rental income by $166,209. Stip. of Facts ¶ 13.

15. Chevron would not invest in lessee-dealer stations except for its expectation that Chevron gasoline will be sold at such stations. Stip. of Facts ¶ 14. Chevron recovers its expenses and investment costs relating to lessee-dealer stations (ground-lease rents, real property taxes, ordinary maintenance, and depreciation) in Hawaii and throughout the United States through the combination of rental revenue and earnings on Chevron gasoline sold through the stations. Stip. of Facts ¶ 17.

2. Table 1 is an accurate summary of the projected rents for each Chevron lessee-dealer station in Hawaii for the first year of Act 257. Table 1 also reflects the agreement Chevron has with its lessee-dealers pending final disposition of this lawsuit. That agreement limits the rent Chevron charges during the pendency of this lawsuit but provides for dealers who benefit from that limit to make additional payments to Chevron in the event Chevron prevails in this lawsuit. Stip. of Facts ¶¶ 5, 11. The court has no empirical data on the full impact of Act 257.

16. Chevron's evaluation of the return on investment from the development of new lessee-dealer stations in Hawaii and throughout the United States includes in the return a measure of the expected earnings from the sale of Chevron-branded gasoline at the station. Stip. of Facts ¶ 18.

17. In the aggregate, Chevron has not within the last 20 years recovered its expenses relating to dealer stations (ground lease rents, real property taxes, ordinary maintenance, and depreciation) in Hawaii or elsewhere in the United States from dealer station rents. Stip. of Facts ¶ 23.

18. However, when all sources of revenue are considered, Chevron has positive net earnings from selling gasoline to Hawaii resellers. Stip. of Facts ¶ 22.

*Oil companies will raise wholesale gasoline prices to offset any decrease in rent imposed by Act 257, and this increase in wholesale prices will cause retail prices to increase.*

19. It makes no sense to consider revenues from rent separately from revenues from gasoline sales for purposes of an economic analysis. Oil companies consider both sources of revenues in setting their rents and gasoline prices and in making investment decisions. Trial Testimony by John Umbeck, Tr. at 61:9–62:9, 104:21–105:13. Chevron determines the optimal mix between rent and gasoline charges based on the total package cost that dealers or the market will permit. Different oil companies have different views on the optimal mix. Trial Testimony by Keith Leffler, Tr. at 97:14–20, 145–6:146–21.

20. A fixed cost, or sunk cost, is one that occurs "independently of how much the firm produces, or whether it produces at all." Decl. of Keith Leffler (Ex. 1) ¶ 22 (quoting G. Silberberg, *Principles of Microeconomics* 261 (Prentice Hall 1995)). Rent is a fixed cost. Trial Testimony by John Umbeck, Supp. Tr. at 10:8–13.

21. Both sides agreed that, because rent is a fixed cost, lessee-dealers will not pass the savings from a decrease in rent onto consumers in the form of lower retail prices. Instead, dealers will pocket the savings. Therefore, a decrease in rent will not, by itself, lower the retail price. Trial Testimony by John Umbeck, Supp. Tr. at 9:15–10:13, 11:17–12:8.

22. To the extent observations on the subject are available, demand for gasoline is inelastic in Hawaii. Elasticity is determined by comparing the percentage change in the quantity of gasoline sold to the percentage change in the price of gasoline. Trial Testimony by John Umbeck, Tr. at 34:9–14. Thus, to say the demand appears inelastic is to say that, to the extent observations have been made on the subject, changes in the retail price of gasoline have caused the volume of gasoline purchased to change by proportionally less than the change in price.

23. Chevron will increase its wholesale gasoline price to offset the reduction in rental revenue it receives as a result of Act 257. Decl. of John Umbeck (Ex. 14) ¶ 20. Dealers will respond to the increase in the wholesale price by raising retail prices. Trial Testimony by Keith Leffler, Tr. at 100:4–9, 142:3–8, 142:21–23; Trial Testimony by John Umbeck, Supp. Tr. at 6:3–5, 10:13–16, 12:9–10. This will cause the volume of gasoline sold by Chevron to decrease because the customers at Chevron stations that increase retail prices will respond to the higher retail prices by purchasing less gasoline and by defecting to stations that have not raised retail prices. Trial Testimony by John Umbeck, Supp. Tr. at 6:5–8.

24. This decrease in volume will prevent Chevron from raising the wholesale price enough to offset completely lost rental revenues. Chevron will be able to offset those lost revenues only partially. Trial

Testimony by John Umbeck, Supp. Tr. at 5:15–6:10.

25. Chevron may accomplish this partial offset by raising wholesale prices only for the lessee-dealer stations affected by Act 257's rent cap. Setting wholesale prices for specific stations would be a change in Chevron's pricing practice in Hawaii. In Hawaii, Chevron's current policy is to treat each island as a separate wholesale price zone. Presumably, this policy is optimal for maximizing profits. In some markets, such as Los Angeles and San Francisco, where administrative costs are not prohibitive, Chevron has multiple price zones within a city. To do the same in Hawaii would not cause administrative costs to increase very much. Trial Testimony by John Umbeck, Supp. Tr. at 6:19–8:12.

26. Testifying for the State, Prof. Leffler opined that Chevron will not raise the wholesale price in response to the rent cap. The court is not persuaded by Prof. Leffler. Prof. Leffler opined that Chevron would not raise the wholesale gasoline price because that would cause retailers to buy less gasoline from Chevron. Decl. of Keith Leffler (Ex. 1) ¶ 16. Prof. Leffler explained that, as any rational oil company would maximize its profit, the wholesale price charged even without the effect of Act 257 must already be the highest price the oil company could charge to maximize its profits. He concluded that Act 257 would therefore not cause an increase in the wholesale price because this would not maximize profits. Decl. of Keith Leffler (Ex. 1) ¶ 17; Trial Testimony by Keith Leffler, Tr. at 185:22–186:14, Supp. Tr. at 13:22–14:5. According to Prof. Leffler, the wholesale price turns on demand, supply, and the relationships among the few suppliers, not on rent. Decl. of Keith Leffler (Ex. 1) ¶ 17.

27. Prof. Leffler ignores the relationship of rent to the wholesale price. As noted above, oil companies look at their total return and find the optimal mix among sources of revenue. The wholesale price is always set in light of the rent being charged. Trial Testimony by John Umbeck, Supp. Tr. at 15:5–23. Typically, dealer rents are below market, so the idea of "profit maximizing" does not appear to apply to individual components of the total return. Trial Testimony by John Umbeck, Tr. at 68:14–69:11.

28. Testifying for Chevron, Prof. Umbeck opined that Chevron would raise the wholesale gasoline price despite the possibility that sales would decrease if retail prices increased as a result. Prof. Umbeck noted that, even with a loss in sales volume, an increase in its wholesale price would allow Chevron to recoup part of the rent reduction, while holding wholesale prices steady would force Chevron to bear the full impact of the rent reduction. Decl. of John Umbeck (Ex. 14) ¶ 22.

29. Implicit in Prof. Umbeck's opinion is the assumption that Chevron will risk a drop in sales volume in the hope that it will be outweighed by the increase in the wholesale price, such that wholesale gasoline revenues increase. If Chevron holds wholesale prices steady, then Chevron is guaranteed to lose the full difference between the rent it would have charged and the maximum rent allowed by Act 257. Under these circumstances, there is no evidence that Chevron would choose the guaranteed drop in revenue that would result from the rent cap if wholesale prices were not changed, rather than at least some possible recoupment of the reduced rent revenue through increased wholesale prices.

30. Prof. Umbeck's testimony is more persuasive than Prof. Leffler's on this point. At trial, the court had the opportunity to observe the demeanor of both witnesses during their cross-examinations and

redirect examinations. Both were qualified as experts by the court, without objection by any party, and were permitted to present opinions in this case under Fed. R.Evid. 702. Both were clearly experienced economists well-versed in the circumstances of this case. Neither witness gave the court any reason to think the witness was insincere, although both were cautious and guarded in their responses. On occasion, both appeared reluctant to answer particular questions directly, attempting instead to impose boundaries to the questions, sometimes more than appeared warranted. Prof. Umbeck engaged in this practice more than Prof. Leffler did. Nevertheless, on the issue of whether wholesale prices would increase, the court was ultimately persuaded by Prof. Umbeck that they would increase. The court looked for but cannot point to demeanor evidence supporting this finding. The court instead relies on the logic and consistency of Prof. Umbeck's testimony on this point, as noted in the preceding paragraphs.

31. Act 257 will not advance its stated interest of lowering consumer gasoline prices. As noted above, lessee-dealers will not pass on any savings in rent to consumers in the form of lower retail prices. Instead, dealers will pocket the savings for themselves. The direct effect of Act 257 will actually be to cause retail gasoline prices to increase in response to higher wholesale gasoline prices, as noted above. *Act 257 will enable lessee-dealers to sell their leaseholds at a premium.*

32. Chevron's leases and supply contracts with lessee-dealers permit the lessees to assign their occupancy rights, subject to obtaining Chevron's written consent and paying a transfer fee set by Chevron before the assignment of any lease or any interest in a lease. Stip. of Facts ¶ 26.

33. Neither Chevron's dealer lease nor Chevron's dealer supply contract limits the price at which a lessee-dealer may sell, convey, or otherwise transfer its occupancy rights. Stip. of Facts ¶ 27. Nor does Act 257 prohibit the sale, conveyance, or other transfer of leases by service station dealers, or limit in any way the price at which a lessee dealer may sell, convey, or otherwise transfer its interest in a service station lease. Stip. of Facts ¶¶ 28, 29.

34. From 1992 to 1998, 14 Chevron lessee-dealers sold their interests in their gasoline stations to other entities. Stip. of Facts ¶ 32. Chevron expects that further assignments of leases and supply contracts will occur in the future. Stip. of Facts ¶ 33.

35. In Hawaii, a Chevron lessee-dealer's earnings from gasoline sales depend on factors that include the dealer's expertise and business acumen, the location of the station, the features of the station, the location of competitors' stations, the pricing at competitors' stations, the lessee-dealer's rent, other station costs, and the price paid by the dealer to Chevron for gasoline. Stip. of Facts ¶ 26.

36. Assuming everything else remains equal, the market value of a lessee-dealer's leasehold could reasonably be expected to increase as the amount of the rent payable decreases. Stip. of Facts ¶ 35.

37. Having accepted Chevron's argument that wholesale prices will increase in response to the rent cap, the court finds that "everything else," referred to in the preceding paragraph, will not remain equal. Nevertheless, a preponderance of the evidence establishes that Act 257 will enable lessee-dealers to sell their leaseholds at a premium.

38. Act 257's rent cap will generate a premium that reflects the difference between the incumbent dealer's expected market rent and the lower rent resulting from Act 257, discounted by the appropri-

ate interest rate for the expected life of the station. Decl. of John Umbeck (Ex. 14) ¶ 23. As noted above, the increase in wholesale gasoline prices will not completely offset the decrease in rent. The resulting benefit to the lessee-dealer shows up in the premium.

39. Prof. Leffler disagreed that Act 257 would create a premium. He pointed to the many unknown variables that would affect the creation of a premium, such as future rent, future gasoline margins, and stations' sales of products other than gasoline. Decl. of Keith Leffler (Ex. 1) ¶ 24. The court disagrees. Economic theory takes these unknown variables into account by predicting expected values that will be capitalized in the form of a premium. Decl. of John Umbeck (Ex. 14) ¶ 29. Even though some purchasers may overestimate or underestimate the value of the premium, on average, the value of each premium paid will equal the actual present value of the rent reduction. Decl. of John Umbeck (Ex. 14) ¶ 30.

40. Prof. Leffler opined that a second reason lessee-dealers would not fully capture a premium from rent reductions is that the market for the sale of lessee-dealer rights in Hawaii is not perfectly competitive. Decl. of Keith Leffler (Ex. 1) ¶ 24. Again, the court disagrees. Prof. Leffler admitted on cross-examination that he did not know whether the market is perfectly competitive or not. Testimony by Keith Leffler, Tr. at 98:13–24. Moreover, the evidence Prof. Leffler relied on did not actually prove his point. Prof. Leffler relied on the low number of sales of dealer rights per year. Decl. of Keith Leffler (Ex. 1) ¶ 24. However, the number of sales of dealer rights per year says nothing about the competitive nature of the market. For example, perfect competition may take the form of an auction with many potential buyers who bid against each other. Even though only one sale is

actually made, the market is still perfectly competitive. Because a lessee-dealer will not sell his lease unless he receives an offer price with a present value equal to the present value of his expected income stream, the sale price will fully capture the original dealer's expected future value in the form of a premium. Decl. of John Umbeck (Ex. 14) ¶ 31.

41. At trial, the court expressed concern that the State had not cross-examined Prof. Umbeck at all on the issue of the asserted premium. The court had envisioned that, in the wake of the Ninth Circuit's decision in this case, both parties would conduct vigorous cross-examination on all issues. That did not occur. The State's counsel explained that the State had made a "strategic decision" not to touch the premium issue. Tr. at 200:13–203:11. The court would have been greatly aided by crossexamination on this subject. The Ninth Circuit clearly contemplated that such cross-examination would illuminate the factfinding process. Without the anticipated cross-examination, the court examines whether Chevron's argument as to the existence of a premium is supported by a preponderance of the evidence. It is.

*Instead of decreasing retail gasoline prices by maintaining the presence of lessee-dealers in the market, Act 257 will increase retail gasoline prices by reducing the number of lessee-dealers.*

42. Prof. Leffler testified that gasoline prices in Hawaii are relatively high at the wholesale and retail levels because of (a) high taxes; (b) high concentration at the wholesale level; and (c) high barriers to entry that dissuade new companies from entering the market. These barriers include substantial fixed costs, regulatory impediments to building new terminals, an oversupply of gasoline stations in the market, and an adverse political climate, in-

cluding rent controls, government proposals to take over petroleum terminals, and restrictions on the location and types of stations that may be built. Trial Testimony by Keith Leffler, Tr. at 114:13–117:14, 118:17–120:8.

43. The State contends that Act 257 will prevent oil companies from raising lessee-dealers' rents to unprofitable levels and thereby driving them out of business. *See* Defs.' Final Written Argument at 1–2. The State argues that, by maintaining the presence of lessee-dealers, Act 257 will lessen the anti-competitive impact of the highly concentrated wholesale gasoline market. Act 257 will do this, according to the State, by (a) preventing increased concentration at the retail level and (b) deterring cooperative pricing among the relatively few suppliers of gasoline at the wholesale level. Decl. of Keith Leffler (Ex. 1) ¶¶ 13, 14. The court is unpersuaded.

44. Prof. Leffler admitted that the rents that Chevron and other oil companies charge their lessee-dealers do not cause wholesale and retail gasoline prices in Hawaii to be high. Trial Testimony by Keith Leffler, Tr. at 120:11–16, 121:17–24.

45. Admittedly, the rent cap of Act 257 precludes oil companies from raising rents to levels designed to drive lessee-dealers out of business. Decl. of Keith Leffler (Ex. 1) ¶¶ 19. However, there is no evidence that, but for Act 257, Chevron or any other oil company would try to drive its lessee-dealers out of business in Hawaii by charging excessive rent. In fact, at the time Act 257 went into effect in 1997, Chevron charged rents that were relatively low. Trial Testimony by Keith Leffler, Tr. at 105:19–25, 162:11–163–5.

46. Prof. Leffler admitted that the percentage of lessee-dealers does not affect the wholesale concentration level or any of the other causes of high wholesale and retail gasoline prices in Hawaii. Trial Testimony by Keith Leffler, Tr. at 120:23–121:7, 121:12–16.

47. Act 257 will not alter the concentration level in the wholesale gasoline market. If Act 257 were to have any impact, it would be at the retail level, i.e., on the number of retail gasoline stations and lessee-dealers. Trial Testimony by John Umbeck, Tr. at 66:9–17.

48. Oil companies, not lessee-dealers, decide whether to build new lessee-dealer stations. Trial Testimony by Keith Leffler, Tr. at 123:1–9. Therefore, to determine how Act 257 affects decisions to build new lessee-dealer stations, the court focuses on the oil company's economics. Those economics will cause the number of lessee-dealer stations to decrease.

49. By reducing rental revenues, Act 257 discourages oil companies from investing in lessee-dealer stations rather than other types of gas stations. As noted above, the decrease in rental revenue will not be completely offset by an increase in the wholesale gasoline price. Therefore, oil companies will receive less total revenue from lessee-dealer stations than before, leading oil companies to avoid investing in new and existing lessee-dealer stations. This means that there will ultimately be fewer lessee-dealer stations than there would be without Act 257. Decl. of John Umbeck ¶¶ 15–17; Trail Testimony by Keith Leffler, Tr. at 182:12–19.

50. Act 257's rent cap will not cause lessee-dealers to remain in the market longer by lowering their operating costs. Although lessee-dealers will not have to pay as much rent, they will have the opportunity to capture the value of the rent reduction upon sale in the form of a premium, which they can then invest and earn a return on. Lessee-dealers will incorporate the cost of this opportunity into their operating costs. This opportunity cost will be

exactly equal to the reduction in the monthly rent. Therefore, lessee-dealers' total operating costs will not decrease, and they will have no incentive to remain in the market longer than they otherwise would have. Decl. of John Umbeck ¶ 25.

51. Fewer lessee-dealer stations in the market means that retail prices will increase. In the first place, fewer lessee-dealers means greater concentration at the retail level, which means less intrabrand and interbrand competition. In the second place, the fewer lessee-dealers there are, the easier it is for wholesale gasoline suppliers to engage in cooperative pricing, leading ultimately to higher wholesale and retail prices. Decl. of Keith Leffler ¶¶ 13–15.

### III. *CONCLUSIONS OF LAW.*

■ 1. The Takings Clause of the Fifth Amendment of the United States Constitution states, in relevant part, "Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the states through the Fourteenth Amendment. *See, e.g., Dolan v. City of Tigard,* 512 U.S. 374, 383–84, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994).

■ 2. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Chevron Appeal,* 224 F.3d at 1033 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)).

3. Act 257 effects a regulatory taking if it does not "substantially advance a legitimate state interest." *See Chevron Appeal,* 224 F.3d at 1037; *see generally Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Chevron has the burden of proving by a preponderance of the evidence that Act 257 does not substantially advance a legitimate state interest. *Chevron Appeal,* 224 F.3d at 1037.

■ 4. The State has a legitimate state interest in lowering consumer gasoline prices. *See Chevron Appeal,* 224 F.3d at 1033 n. 3; *see also Nollan v. California Coastal Com'n,* 483 U.S. 825, 834–35, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)(a broad range of governmental purposes satisfies the requirement of a legitimate state interest).

■ 5. Act 257 does not substantially advance this legitimate state interest. To the contrary, as noted above, Act 257 will cause consumer gasoline prices to increase. Gasoline suppliers will raise wholesale gasoline prices to offset the reduction in rental income, causing dealers to raise retail gasoline prices in response. Act 257 will also cause retail prices to increase by reducing the presence of lessee-dealers in the market. Act 257's rent cap discourages oil companies from investing in lessee-dealer stations. Under the Petroleum Marketing Practices Act (the "PMPA"), 15 U.S.C. §§ 2801–2806 (1998), an oil company may decline to renew a franchise relationship if renewal is "likely to be uneconomical to the franchisor," 15 U.S.C. § 2802(b)(3)(D)(i)(IV) (1998), subject to certain conditions, *see* 15 U.S.C. § 2802(b)(3)(D)(ii)-(iii) (1998).

6. Under Act 257, a lessee-dealer realizes a premium if it sells its leasehold. While premiums are not all unconstitutional *per se,* Act 257's premium undermines the legitimate state interest in lowering consumer gasoline prices. In *Richardson v. City and County of Honolulu,* 124 F.3d 1150, 1165–66 (9th Cir.1997), the Ninth Circuit held a rent cap unconstitutional because the rent cap did not substantially further a legitimate state interest. *Richardson* concerned the constitutionality of the City and County of Honolulu's Ordinance 91–96. Ordinance 91–96 capped renegotiated rents on the land underlying owner-occupied condominiums and provid-

ed that, if a lease was transferred to another owner-occupant, the transferee would enjoy the benefit of the capped rent. *See id.* at 1163–64. Ordinance 91–96 therefore was intended to create affordable owner-occupied housing directly by decreasing the land rents that condominium owner-occupants had to pay. *See id.* at 1165. However, the Ninth Circuit found that the price of housing would not ultimately change because an owner-occupant who sold his condominium would charge the buyer a premium reflecting the value of the decreased land rent. The lack of a mechanism to preclude lessees from capturing this premium prevented Ordinance 91–96 from substantially furthering a legitimate state interest, thereby rendering it unconstitutional. *See id.* at 1166.

7. Unlike Ordinance 91–96, Act 257 was not designed to lower retail gasoline prices directly through reduced rents. The parties agree that any rent savings will be pocketed by lesseedealers. Instead, the State says, Act 257 will lower retail gasoline prices indirectly, by maintaining the presence of lessee-dealers in the market through reduced operating costs. Act 257 fails to accomplish this goal because lessee-dealers who benefit from Act 257's rent cap will be able to sell their leaseholds at a premium. The opportunity to capture this premium will be reflected as an operating cost, which will be equal in magnitude to the reduction in rent the lessee-dealers enjoy. Therefore, lessee-dealers' total operating costs will not change, giving lessee-dealers no added incentive to remain in the market.

8. There is no evidence that Act 257 will protect any lessee-dealer from being driven out of the market. There is no evidence that, but for Act 257, oil companies would try to drive lessee-dealers out of business by raising rents. Moreover, the PMPA already prevents an oil company from raising rents for the purpose of driving dealers out of business and converting the premises to company-operated stations. 15 U.S.C. § 2802(b)(3)(A)(ii) (1998).

9. Act 257 effects an unconstitutional regulatory taking given its failure to substantially advance any legitimate state interest.

## IV. *ORDER.*

Based on the above findings of fact and conclusions of law, the court declares the rent cap in Act 257 unconstitutional. Act 257's imposition of a cap on the rent that an oil company may charge a lessee-dealer does not substantially advance the State's legitimate interest in lowering gasoline prices. The previously entered judgment in favor of Chevron stands.

IT IS SO ORDERED.