**COMMERCIAL BUILDERS OF NORTH-ERN CALIFORNIA, and its affected members, Plaintiffs–Appellants,**

**v.**

**CITY OF SACRAMENTO, Council of the City of Sacramento, Defendants–Appellees.**

**No. 89–16398.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1991.

Decided Aug. 7, 1991.

Edward J. Connor, Jr. and John M. Groen, Pacific Legal Foundation, Sacramento, Cal., for plaintiffs-appellants.

Alletta D'A. Belin, Marc B. Mihaly and W. Robert Ward, Jr., Shute, Mihaly & Weinberger, San Francisco, Cal., for defendants-appellees.

Before SCHROEDER, BEEZER and NOONAN, Circuit Judges.

SCHROEDER, Circuit Judge:

### INTRODUCTION

Commercial Builders appeals the district court's grant of summary judgment in favor of the City of Sacramento in Commercial Builders' suit challenging a city ordinance to help expand available low-income

housing. The Ordinance in question conditions certain types of nonresidential building permits upon the payment of a fee intended to offset the burdens on the city caused by low-income workers who move there to fill jobs created by the project in question. Appellants are a group of commercial developers who filed suit contending the ordinance constitutes a taking under the fifth and fourteenth amendments.

The district court granted summary judgment in favor of the city, holding that the Ordinance did not effect an unconstitutional taking. It specifically found that the Ordinance substantially advanced a legitimate interest and that the city had adequately supported its contribution requirement by showing a sufficient nexus between nonresidential development and the demand for low-income housing. The court therefore concluded that the ordinance was not infirm under *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), which requires such a nexus between land use restrictions and the articulated purpose behind them. Because we agree that the Ordinance here at issue does not amount to an unconstitutional taking, we affirm.

## DISCUSSION

In 1987, the City and County of Sacramento commissioned a consulting firm, Keyser–Marston Associates, to study the need for low-income housing, the effect of nonresidential development on the demand for such housing, and the appropriateness of exacting fees in conjunction with such development to pay for such housing. Keyser–Marston submitted its report, estimating the percentage of new workers in the developments that would qualify as low-income workers and would require housing. As instructed, it also calculated fees for development based on a yearly subsidy of $12,000 per qualified household that would be connected to the development. This figure represented the difference between $42,000, the minimum cost of building a two-bedroom apartment, and $30,000, the maximum rental income expected from a low-income household. Also

as instructed, however, in the interest of erring on the side of conservatism in exacting the fees, it reduced its final calculations by about one-half.

Based upon this study, the City of Sacramento enacted the Housing Trust Fund Ordinance on March 7, 1989. The Ordinance lists several city-wide findings, including the finding that nonresidential development is "a major factor in attracting new employees to the region" and that the influx of new employees "create[s] a need for additional housing in the City." Pursuant to these findings, the Ordinance imposes a fee in connection with the issuance of permits for nonresidential development of the type that will generate jobs. The fees, calculated using the Keyser–Marston formula, are to be paid into a fund to assist in the financing of low-income housing. The city projects that the fund will raise about $3.6 million annually, nine percent of the projected annual cost of $42 million for the needed housing. Additional money will come from other sources, such as debt funding and general revenues.

■ Commercial Builders does not argue that the city lacks a legitimate interest in expanding low-income housing. Rather, it contends that this Ordinance constitutes an impermissible means to advance that interest, because it places a burden of paying for low-income housing on nonresidential development without a sufficient showing that nonresidential development contributes to the need for low-income housing in proportion to that burden. We affirm because we find the Ordinance sufficiently related to the legitimate purpose it seeks to achieve.

We have held that a condition placed upon the granting of a permit to develop land may constitute an impermissible taking, but we have done so only where the condition lacked any rational relationship to the project for which the permit was sought. In *Parks v. Watson*, 716 F.2d 646 (9th Cir.1983), we held that where a developer seeking vacation of platted streets offered to pay for such vacation, a city could not insist that the developer dedicate its geothermal wells to the city as a precon-

dition for such vacation. The dedication requirement, we held, "had no rational relationship to any purpose related to the vacation of the platted streets." 716 F.2d at 653. The condition therefore violated the fifth amendment.

We noted in *Parks* that the analysis we applied was based upon a consensus among the states that had considered the constitutionality of subdivision exaction regulations. 716 F.2d at 653. Prior to *Nollan,* other federal courts similarly upheld ordinances placing restrictions or conditions upon development where the ordinances were reasonably related to legitimate public purposes. *See, e.g., Rogin v. Bensalem Township,* 616 F.2d 680, 690–92 (3d Cir. 1980), *cert. denied sub nom. Mark–Garner Associates v. Bensalem Township,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Maher v. City of New Orleans,* 516 F.2d 1051, 1064–67, *reh'g denied,* 521 F.2d 815 (5th Cir.1975), *cert. denied,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976); *Texas Landowners Rights Ass'n v. Harris,* 453 F.Supp. 1025, 1031–32 (D.D.C.1978), *aff'd mem.,* 598 F.2d 311 (D.C.Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). Under this analysis, the Ordinance here at issue cannot be said to work an unconstitutional taking. It was enacted after a careful study revealed the amount of low-income housing that would likely become necessary as a direct result of the influx of workers that would be associated with the new nonresidential development. It assesses only a small portion of a conservative estimate of the cost of such additional housing. The burden assessed against the developers thus bears a rational relationship to a public cost closely associated with such development.

■ The appellants contend that, even if the Ordinance would pass constitutional muster under these principles, it must be struck down because the Supreme Court has now articulated a more stringent standard under which courts must analyze the imposition of conditions upon development. The appellants point out that in *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the

Court held that such conditions must not only be ones that the government might "rationally have decided" to employ for a given legitimate public purpose; they must also substantially advance such a purpose. *See* 483 U.S. at 834 & n. 4, 107 S.Ct. at 3147 & n. 4. They argue that under the standard articulated in *Nollan,* an ordinance that imposes an exaction on developers can be upheld only if it can be shown that the development in question is directly responsible for the social ill that the exaction is designed to alleviate.

As a threshold matter, we are not persuaded that *Nollan* materially changes the level of scrutiny we must apply to this Ordinance. The *Nollan* Court specifically stated that it did not have to decide "how close a 'fit' between the condition and the burden is required," because it found that the regulation in question "d[id] not meet even the most untailored standards." 483 U.S. at 838, 107 S.Ct. at 3149. It also noted that its holding was "consistent with the approach taken by every other court has considered the question," citing *Parks* as the lead case in its string cite. *Id.* at 839, 107 S.Ct. at 3150. Other circuits that have considered the constitutionality of ordinances that placed burdens on land use after *Nollan.* None have interpreted that case as changing the level of scrutiny to be applied to regulations that do not constitute a physical encroachment on land. *See, e.g., St. Bartholomew's Church v. City of New York,* 914 F.2d 348, 357 n. 6 (2d Cir. 1990), *cert. denied sub nom. Committee to Oppose Sale of St. Bartholomew's Church v. Rector,* —— U.S. ——, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991); *Adolph v. Federal Emergency Management Agency,* 854 F.2d 732, 737 (5th Cir.1988); *Naegele Outdoor Advertising, Inc. v. City of Durham,* 844 F.2d 172, 178 (4th Cir.1988). In keeping with this generally accepted view, we have recently reversed a district court's invalidation, under *Nollan,* of a requirement that a developer undertake off-site measures to mitigate harm to the environment, finding that that court had inappropriately required too close a nexus between the regulation and the interest at stake. *Leroy Land Development v. Tahoe Re-*

*gional Planning Agency,* 939 F.2d 696 (9th Cir.1991), *rev'g Leroy Land Development Corp. v. Tahoe Regional Planning Agency,* 733 F.Supp. 1399 (D.Nev.1990). We see no reason to depart from this view in this case.

We therefore agree with the City that *Nollan* does not stand for the proposition that an exaction ordinance will be upheld only where it can be shown that the development is directly responsible for the social ill in question. Rather, *Nollan* holds that where there is no evidence of a nexus between the development and the problem that the exaction seeks to address, the exaction cannot be upheld. Where, as here, the Ordinance was implemented only after a detailed study revealed a substantial connection between development and the problem to be addressed, the Ordinance does not suffer from the infirmities that the Supreme Court disapproved in *Nollan.* We find that the nexus between the fee provision here at issue, designed to further the city's legitimate interest in housing, and the burdens caused by commercial development is sufficient to pass constitutional muster.

The appellants also place some significance on the fact that this Ordinance is a fee provision. They contend that the fee represents a transfer of property, i.e., the money paid over to the city. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980) (treating a purely financial exaction as a taking). In this respect, they argue, it more closely resembles a physical taking of property, which automatically falls within the purview of the fifth amendment, than a land use regulation, which is subject to a reasonableness analysis. Under appellants' theory, however, compensation would be required for every fee; therefore, every fee would be unconstitutional. We see no valid basis for such a rule.

Indeed, the only circuit court to treat a fee provision as an unconstitutional taking under *Nollan* was ultimately reversed by the Supreme Court. In *Sperry Corp. v. United States,* 853 F.2d 904 (Fed.Cir.1988), the Federal Circuit found unconstitutional a government exaction of a percentage of any award from the Iran Claims Commission. It treated the fee as a physical taking because it constituted a transfer of the possession of property. 853 F.2d at 906–07. It then invalidated it because it found the exaction arbitrary. *Id.* at 908. The infirmity, the court held, was the assessment of the cost of the Iran hostage crisis only against those who successfully asserted claims associated with Iranian interests. Because that crisis was a national concern, the court concluded, the burden should instead have been borne equally by the whole nation. *Id.*

The Supreme Court disagreed, holding that the exaction of a percentage of any award made by the Iran Claims Commission was a permissible means of collecting reimbursement for costs incurred in the operation of that Commission. *United States v. Sperry Corp.,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). The Court expressed doubts as to the appropriateness of the Federal Circuit's analysis of the fee under principles applicable to physical takings, noting that "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible." 110 S.Ct. at 395 n. 9. Under this reasoning, the Ordinance does not, as appellants suggest, constitute a taking per se.

In *Webb's Fabulous Pharmacies,* 449 U.S. 155, 101 S.Ct. 446, upon which these appellants have also relied, the Court struck down a Florida statute that confiscated all interest on interpleader funds deposited with the state courts. The Court there reasoned that the statute in question served no purpose, because another Florida statute required that parties make payments for the services rendered by court personnel in maintaining such funds. 449 U.S. at 163–64, 101 S.Ct. at 451–52. The appellants argue in this case that the Ordinance here at issue is similarly unrelated to a permissible purpose, contending that the mere desire to generate revenue for the public good cannot, after *Webb's Fabulous Pharmacies,* support the exaction.

■ The *Sperry* Court disposed of a similar argument. Its decision to uphold the deduction from awards was primarily based on the fact that the fee was used to pay for the operations of the tribunal that resolved the disputes of all of those from whom such a fee was collected; thus, a close nexus between the charge and the activity creating the cost was established. The Court indicated, however, that it would have been satisfied with an even looser nexus, stating that "Sperry may be required to pay a charge for the availability of the Tribunal even if it never actually used the Tribunal." 110 S.Ct. at 395–96. A purely financial exaction, then, will not constitute a taking if it is made for the purpose of paying a social cost that is reasonably related to the activity against which the fee is assessed. Again, we conclude that the required nexus is present in this case.

Finally, the appellants contend that, regardless of the standard to be applied in assessing the validity of the Ordinance, they have raised an issue of material fact in their attack on the conclusions of the Keyser–Marston study. This attack came in the form of an affidavit from their planner, David Wade, suggesting that commercial development may be a less decisive factor in worker migration than the Keyser–Marston study indicates. Wade concluded that, in addition to employment opportunity, the availability of low-income housing is itself partly responsible for any influx of low-income employees to Sacramento. Wade also opined that it is at least as true that employers follow the work force as the converse. This affidavit, appellants argue, sufficiently calls into question the city's findings concerning the nexus between its Ordinance and the social ill it sought to cure to preclude summary judgment.

The appellants' argument lacks merit. Even viewing the Wade affidavit in the light most favorable to the developers, it does not rebut the Keyser–Marston conclusion that commercial development is related to an increase in the need for low-income housing. The Ordinance accounts for what the developers characterize as the indirectness of the connection between the creation of new jobs and the need for low-income housing by charging only a small percentage of what the Keyser–Marston study calculated to be the cost of meeting new low-income housing requirements. As we have already noted, nothing in *Nollan* or any other authority cited by the appellants requires the nexus to be more direct than that achieved through the legislative process that the city here employed. We therefore agree with the district court that the Wade affidavit is insufficient to preclude summary judgment.

## CONCLUSION

The district court correctly found that, as a matter of law, Sacramento's Housing Trust Fund Ordinance does not work an unconstitutional taking. Summary judgment in favor of the city was therefore proper.

AFFIRMED.

BEEZER, Circuit Judge, dissenting:

I respectfully dissent.

As Justice Scalia warned in *Nollan*, a state can leverage its police power to the point where a regulation of land use becomes an "out-and-out plan of extortion." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, 107 S.Ct. 3141, 3149, 97 L.Ed.2d 677 (1987). Sacramento's ordinance is a transparent attempt to force commercial developers to underwrite social policy. Apparently, legislators find it politically more palatable to exact payments from developers than to tax their constituents. The Takings Clause prohibits singling out developers to bear this burden.

Historically, courts have upheld exactions when states were able to justify them as serving a public purpose related to the burdens caused by development.[1] For example, courts have sustained requirements

---

1. *See generally* Smith, *From Subdivision Improvement Requirements to Community Benefit Assessments and Linkage Payments: A Brief History of Land Development Exactions*, 50 Law & Contemp.Probs. 5 (Winter 1987).

that developers construct various on-site improvements, such as sewers, water-mains, sidewalks, curbs and gutters, storm drains, and landscaping. Requiring off-site improvements that serve a public purpose, such as roads, schools, parks and sewage treatment plants, may also be justified where the requirement alleviates a public burden or ameliorates harmful effects caused by the development. When the developer is asked to bear a fair share of the burden, such a requirement directly furthers the legitimate interests of the government. *See, e.g., Leroy Land Development v. TRPA*, 939 F.2d 696, 699 (9th Cir.1991). When the governmental exaction solves a problem actually created by the development (for example, requiring the developer to provide needed infrastructure), it is no coincidence that the exaction results in a benefit to the development as well as the community.[2]

State and local governments face mounting budget deficits, attributable to decreased federal funding, recessionary pressures on tax collection and the growing popularity of "taxpayer revolts"—the most well-known example of which is California's Proposition 13.[3] In response, state and local governments have begun to stretch the use of exactions to the breaking point.[4] Sacramento would have developers pay not just for public improvements necessitated by development, but for private subsidies with little or no causal connection to development. Not surprisingly, under a scheme requiring no connection, no benefit accrues to the development in return.

It is no longer the case that exaction requirements are imposed only when the direct benefit to the land and extra costs to government created by development

are demonstrable. Instead, exaction fees have approached ... "grand theft," as the benefit to private landowners has become marginal, or in some cases, non-existent, and the public need attributable to new development more tenuous and theoretical.

Smith, supra note 1, at 29 (footnotes omitted).

Sacramento has commissioned a study that demonstrates at best a tenuous and theoretical connection between commercial development and housing needs. But the Takings Clause requires a cause-and-effect relationship between the two. *Pennell v. San Jose*, 485 U.S. 1, 20, 108 S.Ct. 849, 862, 99 L.Ed.2d 1 (1988) (Scalia, J., dissenting). In my view, Sacramento has not shown such a relationship. Even the study relied on by the city to support the ordinance states that its "nexus analysis does not make the case that building construction is responsible for growth."

The ordinance is nothing more than a convenient way to fund a system of transfer payments. Although Sacramento attempts to justify the ordinance as an exercise of its police power, the city actually is exercising its taxing power—free of the encumbrances generally thought to limit the exercise of that power.

The traditional manner in which American government has met the problem of those who cannot pay reasonable prices for privately sold necessities—a problem caused by the society at large—has been the distribution to such persons of funds raised from the public at large through taxes, either in cash (welfare payments) or in goods (public housing, publicly subsidized housing, and food stamps). Un-

---

2. *See, e.g., Hollywood Inc. v. Broward County*, 431 So.2d 606 (Fla.Dist.Ct.App.), *cert. denied*, 440 So.2d 352 (1983). Upholding a county ordinance requiring the dedication of land or payment of a fee to assist the county in acquiring and developing parks, the court noted that (1) the funds had to be expended within a reasonable time, (2) the funds had to be used to meet the need created by the development, and (3) the park system thereby provided would "substantially benefit the residents of the platted area." *Id.* at 612.

3. Bauman & Ethier, *Development Exactions and Impact Fees: A Survey of American Practices*, 50 Law & Contemp.Probs. 51, 51–52 (Winter 1987); Blaesser & Kentopp, *Impact Fees: The "Second Generation,"* 38 Wash.U.J.Urb. & Contemp.L. 55, 59 (1990).

4. Honolulu is considering an ordinance that would impose a similar low-income housing fee on golf-course developers. Cabrera, *Taxman, Spare That Golf Course*, Wall St.J., July 11, 1991, at A10, col. 3.

less we are to abandon the guiding principle of the Takings Clause that "public burdens ... should be borne by the public as a whole," this is the only manner that our Constitution permits.

*Pennell,* 485 U.S. at 21–22, 108 S.Ct. at 863 (Scalia, J., dissenting) (citation omitted).

The new workers attracted by the new jobs associated with the new development surely will increase the demand for all manner of goods and services. If Sacramento has shown a sufficient causal connection in this case, we can be expected next to uphold exactions imposed on developers to subsidize small business retailers, child-care programs, food services and health-care delivery systems.