363 F.3d 846
 CHEVRON USA, INC., a Pennsylvania Corporation, Plaintiff-Appellee,
v.
Margery S. BRONSTER, Attorney General of the State of Hawaii, Defendant, and
Linda Lingle, Governor of the State of Hawaii; Mark J. Bennett, Attorney General of the State of Hawaii, Defendants-Appellants.
 No. 02-15867.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted November 10, 2003.
 Filed April 1, 2004.
 As Amended April 15, 2004.
 
 Robert G. Dreher, Special Deputy Attorney General, Troutman Sanders LLP, Washington, D.C., for the defendants-appellants.
 Craig E. Stewart, Pillsbury Winthrop LLP, San Francisco, California, for the plaintiff-appellee.
 Appeal from the United States District Court for the District of Hawaii Susan Oki Mollway, District Judge, Presiding. D.C. No. CV-97-00933-SOM.
 Before: D.W. NELSON, BEEZER, and W. FLETCHER, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 Hawaii Governor Linda Lingle ("Hawaii") appeals the district court's holding on remand that Section 3(c) of Act 257 of the 1997 Hawaii State Legislature ("Act 257" or "the Act") effects a regulatory taking in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. Chevron USA, Inc. ("Chevron") challenged the Act, which, inter alia, proscribes the maximum rent that oil companies can collect from dealers who lease company-owned service stations.
 
 
 2
 We have jurisdiction pursuant to 28 U.S.C. § 1331, and we affirm.
 
 
 3
 * In response to concerns about the highly concentrated wholesale gasoline market in Hawaii and the resulting high cost of gasoline to consumers, the Hawaii Legislature enacted Act 257 in 1997. Act 257, among other things, regulates the maximum rent an oil company can charge dealers who lease its service stations. More specifically, Act 257 caps the rent that Chevron and other oil companies can collect from lessee-dealers at 15% of the dealer's profit on gasoline sales and 15% of the dealer's gross sales on products other than gasoline, plus a percentage increase equal to any increase the oil company may be required to pay on its ground lease.
 
 
 4
 Chevron is one of two gasoline refiners and one of six wholesalers in Hawaii. At the retail level, Chevron sells most of its gasoline through company-owned stations, which are leased to independent dealers. Chevron leases 64 service stations to dealers in Hawaii. From 1984 through the end of 1996, Chevron relied on estimated gasoline sales to calculate the rent owed by the lessee-dealers. After determining that the amount of gross rent receipts was not satisfactory, Chevron initiated a new nationwide dealer rental program in January 1997, restructuring the manner in which it calculated lease rates. This program, which the parties agree would be in effect in Hawaii but for Act 257, requires the lessee-dealer to pay a monthly rent, consisting of an escalating percentage of the dealer's gross margin on actual, rather than estimated, gasoline sales. As noted, Act 257, in contrast, establishes a maximum regulated rent of 15% of gross margin.
 
 
 5
 Although Chevron maintains that Act 257 prevents it, through rental payments alone, from recovering its rental expenses, it concedes that over the past 20 years, Chevron has never fully recovered its expenses relating to dealer stations from rental income alone. Instead, Chevron relies on its supply contracts to earn a profit. Dealers who choose to rent a station from Chevron must as a condition of their lease agree to purchase from Chevron all the product necessary to satisfy demand at the station for Chevron gasoline. The price is unilaterally set by Chevron.
 
 
 6
 Both the lease agreement and supply contract permit the lessee-dealer to transfer his or her occupancy rights upon obtaining Chevron's written consent and paying a transfer fee set by Chevron. Act 257 does not prohibit such transfers, nor limit the price at which they can occur.
 
 
 7
 Chevron moved for partial summary judgment on its claim that Act 257 effects an unconstitutional regulatory taking because it fails to "substantially advance a legitimate state interest." Hawaii responded by filing a cross motion for summary judgment on all of Chevron's claims. The district court resolved the motions in Chevron's favor. Chevron USA, Inc. v. Cayetano, 57 F.Supp.2d 1003, 1014 (D.Haw.1998).
 
 
 8
 Hawaii appealed the district court's decision, challenging the standard used to evaluate Chevron's regulatory takings claim and the court's application of that standard. Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1033 (9th Cir.2000), cert. denied, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001) ("Chevron I"). We held that the district court applied the proper standard, relying primarily on the Supreme Court's opinion in Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), and our opinion in Richardson v. City and County of Honolulu, 124 F.3d 1150 (9th Cir.1997), cert. denied, 525 U.S. 871, 119 S.Ct. 168, 142 L.Ed.2d 137 (1998). Id. These cases teach that application of the "substantially advances" test is appropriate where a rent control ordinance creates the possibility that an incumbent lessee will be able to capture the value of the decreased rent in the form of a premium. We observed that genuine issues of material fact remained as to whether Act 257 failed to substantially advance its purpose of lowering retail gasoline prices, thus effecting a regulatory taking. Id. at 1042 ("[A] challenged regulatory action substantially advances its interest if it bears a reasonable relationship to that interest."). We vacated the district court's decision and remanded for "additional factual development and cross-examination of the parties' witnesses" on issues, including whether lessee-dealers will capture a premium based on the increased value of their leaseholds and whether oil companies will compensate for Act 257 by increasing wholesale prices. Id. at 1039, 1042, 119 S.Ct. 168.
 
 
 9
 In a petition for rehearing, Hawaii asserted for the first time that Chevron's challenge to Act 257 should be analyzed under the Due Process Clause, not the Takings Clause. We denied Hawaii's petition for rehearing; the Supreme Court subsequently denied Hawaii's petition for certiorari.
 
 
 10
 On remand, the district court considered the parties' stipulations of fact and the testimony of expert witnesses. The district court held that Act 257 was unconstitutional and issued written findings of fact and conclusions of law. Chevron USA, Inc. v. Cayetano, 198 F.Supp.2d 1182 (D.Haw.2002). The court made a fact finding that rather than decreasing the retail price of gasoline in Hawaii, Act 257 would cause prices to increase. Id. at 1192.
 
 
 11
 On appeal, Hawaii argues that: (1) the district court should have analyzed Chevron's claim under the Due Process Clause rather than the Takings Clause; (2) the court misapplied the requirement that Act 257 "substantially advance a legitimate state interest"; and (3) even if the district court's application of the law was correct, it clearly erred in finding that Act 257 does not, in fact, substantially advance Hawaii's interest in reducing retail gasoline prices.
 
 II
 
 12
 The first two of Hawaii's arguments are barred as law of the case. The law of the case doctrine provides that "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." Bernhardt v. Los Angeles County, 339 F.3d 920, 924(9th Cir.2003) (citation omitted). The doctrine applies to our "explicit decisions as well as those issues decided by necessary implication." Id. It is a discretionary doctrine with three recognized exceptions: (1) the earlier decision is clearly erroneous and its enforcement would work a manifest injustice;[1] (2) intervening controlling authority makes reconsideration appropriate; or (3) substantially different evidence was adduced at a subsequent trial. In re Rainbow Magazine, Inc., 77 F.3d 278, 281 (9th Cir.1996). Only the first two exceptions potentially apply to Hawaii's arguments.
 
 
 13
 A. Chevron I Bars Hawaii's Argument that Chevron Must Challenge Act 257 Under the Due Process Clause
 
 
 14
 Hawaii first argues that Chevron's challenge to Hawaii's rent control ordinance properly lies under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, not the Takings Clause of the Fifth Amendment. Hawaii maintains that claims challenging the validity of a government action based on its failure to "substantially advance a legitimate government interest" must be resolved using due process principles.
 
 
 15
 We explicitly addressed and rejected this argument when it was raised for the first time in Hawaii's petition for rehearing, and implicitly did so in Chevron I when we endorsed the "substantially advances" test over the more deferential test urged by Hawaii. See 224 F.3d at 1033, 1035. In its prior appeal, Hawaii maintained that the appropriate inquiry was whether "the Legislature rationally could have believed the Act would substantially advance a legitimate purpose," the test typically applied to substantive due process challenges to economic legislation. Id. at 1033(emphasis added). Our conclusion that this more deferential, due process standard does not apply to regulatory takings claims challenging land use regulations, including rent control ordinances like Act 257, logically stands as a rejection of Hawaii's current argument that such a challenge must be brought under the Due Process Clause. See id. at 1033, 1034(explaining that in Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 242, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Court applied the more deferential test only because it involved claims of an actual physical taking). This is also consistent with our opinion's refusal to accept the concurring opinion's argument that the Supreme Court established such a rule in Pennell v. City of San Jose, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). Id. at 1034-35, 108 S.Ct. 849 (concluding that Pennell "did not... intimate in any way that rent control provisions should only be analyzed under the Due Process Clause. Rather, the Court determined that the Takings Clause claim was premature and then analyzed the Due Process Clause claim under the Due Process `reasonableness' test") (emphasis added).
 
 
 16
 The law of the case doctrine therefore bars Hawaii's argument unless one of the recognized exceptions applies.
 
 
 17
 Hawaii relies primarily on the Supreme Court's opinion in Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) to argue that our decision in Chevron I was clearly erroneous and will work a manifest injustice. In Eastern Enterprises, the Supreme Court holds that the Coal Industry Retiree Health Benefit Act (the "Coal Act"), which requires coal operators to fund health benefits for retired employees and their dependents, is unconstitutional. 524 U.S. at 508, 118 S.Ct. 2131 (plurality opinion). An operator challenges the law on both due process and takings grounds. Id. at 503-04, 118 S.Ct. 2131. Four Justices conclude that the Coal Act violates the Takings Clause because it imposes severe, unanticipated retroactive liability on the operator and do not proceed to address the operator's due process claim. Id. at 528-29, 118 S.Ct. 2131 (O'Connor, J., joined by Rehnquist, C.J., Scalia & Thomas, JJ.). Justice Kennedy concurs in the plurality's judgment but disagrees with the court's analysis; he concludes that the Coal Act violates the Due Process Clause, not the Takings Clause. Id. at 539-49, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment, dissenting in part). The four remaining Justices dissent, concluding that the Act violates neither the Takings Clause nor the Due Process Clause. Id. at 551-53, 118 S.Ct. 2131 (Stevens, J., dissenting, joined by Souter, Ginsberg & Breyer, JJ.), 553-68, 118 S.Ct. 2131 (Breyer, J., dissenting, joined by, Stevens, Souter & Ginsberg, JJ.).
 
 
 18
 As an initial matter, Eastern Enterprises does not involve the type of regulatory takings claim at issue here. The Supreme Court applies the test set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which focuses on the economic impact of a challenged law, not the "substantially advances" test. Eastern Enterprises, 524 U.S. at 529-37, 118 S.Ct. 2131. Furthermore, the disagreement between the plurality and the other five Justices over whether the challenge to the Coal Act is properly viewed as a due process or takings claim focuses on the following limited question, inapplicable to this case: Whether a regulatory takings claim requires that the challenged regulation affect a "specific property right or interest." 524 U.S. at 540, 541-47, 118 S.Ct. 2131(Kennedy, J., concurring in the judgment, dissenting in part) (observing that the Takings Clause is inappropriate because the Coal Act "does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest"). The plurality endorses a more expansive view encompassing government regulations, like the Coal Act, that result in a "considerable financial burden," 524 U.S. at 529, 118 S.Ct. 2131; the other five Justices would limit the regulatory takings doctrine to laws affecting a protected property interest. Id. at 540-47, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment, dissenting in part); 554 (Breyer, J., dissenting).
 
 
 19
 Largely ignoring this issue, Hawaii relies in part on the following statement in Justice Kennedy's opinion to support its argument that a majority of the Supreme Court has repudiated "substantially advances" takings claims:
 
 
 20
 The imprecision of our regulatory takings doctrine does open the door to normative considerations about the wisdom of government decisions. See, e.g., Agins v. City of Tiburon [cite omitted] (zoning constitutes a taking if it does not "substantially advance legitimate state interests"). This sort of analysis is in uneasy tension with our basic understanding of the Takings Clause, which has not been understood to be a substantive or absolute limit on the government's power to act.
 
 
 21
 524 U.S. at 545, 118 S.Ct. 2131. Justice Kennedy's statement is in the context of a dispute over the proper scope of the regulatory takings doctrine. Indeed, it is immediately preceded by the following:
 
 
 22
 "If the plurality is adopting its novel and expansive concept of a taking in order to avoid making a normative judgment about the Coal Act, it fails in the attempt; for it must make the normative judgment in all events." Id. (citations omitted). Justice Kennedy is merely highlighting the already expansive and inconsistent nature of the Court's precedent. See id. at 545, 118 S.Ct. 2131. Neither Justice Kennedy nor any of the other Justices expresses the opinion that takings claims based on the "substantially advances" theory are no longer valid.
 
 
 23
 The varying opinions in Eastern Enterprises suggest confusion over the relationship between due process and takings claims. They do not require us to abandon our holding in Chevron I, let alone render it clearly erroneous. See, e.g., Assoc. of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1254-55 (D.C.Cir.1998) (concluding that the inability of a majority of the Court to agree on a single rationale for the result renders Eastern Enterprises of no precedential value outside of the specific facts of that case).[2]
 
 
 24
 Supreme Court opinions filed after Eastern Enterprises do not stand as a repudiation of regulatory takings claims based on the "substantially advances" theory. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); City of Monterey v. Del Monte Dunes, 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). In Del Monte Dunes, the Supreme Court upholds a jury verdict against the City of Monterey on a regulatory takings claim that includes the theory that the city's repeated rejection of a development plan does not "substantially advance a legitimate government interest." 526 U.S. at 700-01, 721, 119 S.Ct. 1624. The Court granted certiorari to address the question whether "the Court of Appeals impermissibly based its decision on a standard that allowed the jury to reweigh the reasonableness of the city's land use decision." Id. at 701, 119 S.Ct. 1624. Although the Court does not directly address the propriety of the "substantially advances" test because the city failed to object to its inclusion in the court's jury instructions, id. at 704, 119 S.Ct. 1624 (Scalia, J., concurring), the opinion of the Court states that "the trial court's instructions are consistent with our previous general discussions of regulatory takings liability." Id. (emphasis added). In Tahoe-Sierra Preservation Council, Inc., the Court addresses a regulatory takings claim brought by an association of landowners based on a planning agency's temporary moratorium on development. The Court limits its review to the theory argued by the association in the court of appeals but notes that "[c]onsiderations of fairness and justice" could support a regulatory taking under several theories, including "that the moratoria did not substantially advance a legitimate state interest." 535 U.S. at 334, 122 S.Ct. 1465 (emphasis added). Although dicta, the statement clearly indicates that "substantially advances" claims remain viable under the Takings Clause.
 
 
 25
 Our opinions are consistent with Supreme Court teaching. The Takings Clause supercedes any substantive due process challenges when a law is challenged as a regulatory taking. See Armendariz v. Penman, 75 F.3d 1311, 1324(9th Cir.1996); see also Esplanade Props., LLC v. City of Seattle, 307 F.3d 978, 982 (9th Cir.2002) (rejecting a claim that Eastern Enterprises overruled Armendariz); Weinberg v. Whatcom County, 241 F.3d 746, 749 n. 1 (9th Cir.2001) (applying Armendariz); Buckles v. King County, 191 F.3d 1127, 1137 (9th Cir.1999) (same). We recently applied the "substantially advances" test to a regulatory takings claim in Hotel & Motel Association of Oakland, et al. v. City of Oakland, 344 F.3d 959, 965 (9th Cir. Sept.17, 2003) (asking whether city maintenance and habitability requirements substantially advance a legitimate government interest).
 
 
 26
 Hawaii cites no case post-dating Chevron I that brings our use of the Takings Clause in that case into doubt. See Rainbow Magazine, Inc., 77 F.3d at 281. To the contrary, subsequent opinions of the Supreme Court and this circuit support Chevron I. See, e.g., Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 334, 122 S.Ct. 1465; Esplanade Properties, LLC, 307 F.3d at 982.
 
 
 27
 Hawaii's reliance on Brown v. Legal Foundation of Washington, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003), which affirms Washington Legal Foundation v. Legal Foundation of Washington, 271 F.3d 835 (9th Cir.2001) (en banc), is misplaced. Brown involves, inter alia, the question whether a law requiring lawyers' client funds to be deposited into an interest bearing trust account is properly analyzed as a regulatory or per se taking. 123 S.Ct. at 1417-19; see also Washington Legal Foundation, 271 F.3d at 854-56. The Supreme Court has no reason to address regulatory takings based on a "substantially advances" theory or the question whether such claims should be brought under the Takings Clause or the Due Process Clause.
 
 
 28
 The law of the case doctrine now bars Hawaii's argument that Chevron's challenge properly lies under the Due Process Clause. We previously addressed Hawaii's argument in Chevron I and none of the exceptions to the doctrine are available to Hawaii.
 
 
 29
 B. Chevron I Bars Hawaii's Argument That Act 257 Should Be Reviewed Under a More Deferential Standard
 
 
 30
 Hawaii next argues that we erred in Chevron I by concluding that a given regulation "substantially advances" a legitimate state interest if it bears a "reasonable relationship" to that interest and by instructing that Chevron can establish the lack of such a relationship by showing, by a preponderance of the evidence, that the regulation will not in fact accomplish its stated purpose. Hawaii maintains that even if Chevron's challenge to Act 257 is viewed as a claim under the Takings Clause, the more deferential, rational basis test applied in due process cases is appropriate — i.e., whether Hawaii rationally could have believed that Act 257 could have substantially advanced a legitimate government purpose. We explicitly rejected these arguments as part of Hawaii's prior appeal, 224 F.3d at 1037; Hawaii has not justified departing from the law of the case.
 
 
 31
 In Chevron I we hold that the "substantially advances" test requires a "reasonable relationship" between a legitimate public purpose and the means used to effectuate that purpose. Id. at 1041(citing and quoting from Del Monte Dunes, 526 U.S. at 700-01, 702-03, 119 S.Ct. 1624). Our adoption of the "reasonable relationship," as well as the preponderance of the evidence standard, is based on the jury instructions the Supreme Court approves in Del Monte Dunes. 224 F.3d at 1041(quoting instructions). This "reasonable relationship" test calls for an intermediate level of review, more stringent than the rational basis test used in the due process context, see id. at 1034 (distinguishing physical takings cases, which use a test drawn from due process), but less stringent than the "rough proportionality" test used in the context of exactions under the Takings Clause. Id. at 1041(citing Del Monte Dunes, 526 U.S. at 703-04, 119 S.Ct. 1624 as limiting the "rough proportionality" test to exaction context but commenting positively on jury instruction using "reasonable relationship" language); see also Dolan v. City of Tigard, 512 U.S. 374, 390, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (stating that the "reasonable relationship" test represents an intermediate level of scrutiny). Hawaii's argument that our decision in Chevron I is clearly erroneous is without merit.
 
 
 32
 The Supreme Court specifically rejects the standard proposed by Hawaii. Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Nollan is an exactions case in which the Court states that "[w]e have required that the regulation substantially advance the legitimate state interest sought to be achieved [citing Agins], not that the State could rationally have decided that the measure adopted might achieve the State's objective." 483 U.S. at 825 n. 3, 107 S.Ct. 3141 (internal quotations omitted). In Yee v. City of Escondido, the Supreme Court suggests that this intermediate analysis is applicable to challenges involving rent control ordinances, like Hawaii's, that permit the capture of a premium. 503 U.S. 519, 530, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). Although the Court in Yee does not reach the regulatory takings issue because it is not properly presented for review, the Court does state that the possibility of a premium,"might have some bearing on whether the ordinance causes a regulatory taking" because it may shed light on whether there is a sufficient nexus between the desired ends and the means employed. Id. (citing Nollan). Relying on this language, we hold in Richardson v. City and County of Honolulu that land use regulations, including rent control ordinances that permit the capture of a premium, "[do] not effect a regulatory taking if [they] substantially further[] a legitimate state interest." 124 F.3d at 1164 (citing and quoting from Yee).
 
 
 33
 We explain in Chevron I that Hawaii's reliance on Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) and Keystone Bituminous Coal Ass'n v. De Benedictis, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), as support for using the more deferential rational basis review, is misplaced. The Supreme Court reviews the challenged actions in those cases more deferentially because they involve physical takings. Chevron I, 224 F.3d at 1034 (observing that in the case of a physical taking the government "intends to take the property and is willing to pay compensation") (citing Richardson, 124 F.3d at 1158). Hawaii presents no compelling reasons to rely on those opinions now. Moreover, Hawaii misses the fact that we incorporate this more deferential approach in the regulatory takings context when we review the state's "legitimate purpose"; the higher scrutiny is reserved for the means/ends fit.
 
 
 34
 Hawaii's argument that we apply a more deferential standard in Commercial Builders of Northern California v. City of Sacramento, 941 F.2d 872 (9th Cir.1991), is also misplaced. In Commercial Builders, we apply the intermediate "rational relationship" test. Id. at 873. Our holding that a regulatory taking does not exist is based on evidence that "the Ordinance was implemented only after a detailed study revealed a substantial connection between development and the problem to be addressed." Id. at 875 (emphasis added); cf. id. at 877 (Beezer, J., dissenting) ("Sacramento has commissioned a study that demonstrates at best a tenuous and theoretical connection between commercial development and housing needs."). Plaintiffs in Commercial Builders were unable to "rebut the Keyser-Marston conclusion that commercial development is related to an increase in the need for low-income housing." Id. at 876. In contrast, we held Chevron's claim fit for trial because the plaintiff on summary judgment adduced some evidence rebutting the state's evidence and conclusions. The question now is whether that evidence is sufficient to justify the trial court's judgment in this case. Hawaii fails to establish that our application of the "reasonable relationship" test or the preponderance of the evidence standard constitutes clear error.
 
 
 35
 Hawaii also fails to point to any intervening authority that prohibits Chevron I's use of the "reasonable relationship" test or preponderance of the evidence standard. The law of the case doctrine bars Hawaii's arguments.[3]
 
 III
 
 36
 Hawaii argues that even if the district court applied the correct legal standard, it erred in concluding that Act 257 does not in fact substantially advance a legitimate state interest. The district court on remand heard testimony from Dr. John R. Umbeck, on behalf of Chevron, and Dr. Keith Leffler, on behalf of Hawaii. Based on their testimony, the court made the following relevant findings of fact: (1) oil companies will raise wholesale prices to offset any decrease in rent imposed by Act 257, thereby causing an increase in retail prices, Chevron USA, Inc., 198 F.Supp.2d at 1187; (2) a preponderance of the evidence establishes that Act 257 will enable lessee-dealers to sell their leaseholds at a premium, id. at 1189-90; (3) instead of decreasing retail gasoline prices by maintaining the presence of lessee-dealers in the market, Act 257 will increase gasoline prices by reducing the number of lessee-dealers, id. at 1190-91. Based on these findings, the district court concluded that Act 257 does not substantially advance a legitimate state interest. Id. at 1192.
 
 
 37
 We review the district court's findings of fact for clear error. Stratosphere Litigation LLC v. Grand Casinos, Inc., 298 F.3d 1137, 1142 (9th Cir.2002). We review the district court's conclusions of law de novo. Id.
 
 
 38
 Hawaii does not challenge the district court's conclusion of law that Act 257 fails to advance Hawaii's goal of lowering retail gas prices, see Chevron USA, Inc., 198 F.Supp.2d at 1189, 1192-93; it focuses instead on whether Act 257 advances another purported purpose — namely, maintaining the existence of an independent body of gas station operators by preventing oil companies from raising rents to levels that would drive lessee-dealers out of business. The contention that Hawaii passed Act 257 to promote the viability of lessee-dealers for their own sake without regard to retail prices is inconsistent with the express views of the Hawaii Legislature in enacting Act 257. The Act's legislative findings and declarations state that:
 
 
 39
 Because Hawaii is physically small and a geographically remote economy, certain of its markets tend to be concentrated.... In a highly competitive market, market prices tend to rise above competitive levels. Market prices persistently above competitive levels are harmful to consumers and the public. (Emphasis added.) Act 257 failed to include a similar statement of legislative intent expressing a concern for lessee-dealers. Hawaii's current argument is also inconsistent with its position throughout this litigation and the testimony of its expert. The district court found that "while the legislature was mindful of the need to protect lessee dealers, this consideration was essentially a step toward the ultimate goal of reducing gasoline prices for Hawaii consumers." Chevron USA, Inc., 57 F.Supp.2d at 1010. We accepted this characterization in Chevron I when we stated that "the district court found the purpose of Act 257 is to `reduc[e] gasoline prices for Hawaii's consumers'" and that "[o]n appeal, the parties do not contest this finding." 224 F.3d at 1033 n. 3 (emphasis added). Our prior opinion observes that whether Act 257 substantially advances its purpose "certainly depends on whether it will in fact lead to lower prices." Id. at 1041. Hawaii's expert, Dr. Keith Leffler, himself acknowledged the legislative connection between protecting lessee-dealers and the ultimate goal of lowering retail prices in his testimony before the district court: "The lease rent cap imposed by Act 257 is likely to lessen the adverse competitive effects that result from the highly concentrated gasoline markets in Hawaii by maintaining the viability of independent dealers and thereby benefit consumers by reducing gasoline prices below what they would be otherwise." The district court properly viewed Hawaii's concern over maintaining a network of independent lessee-dealers as a means to reducing retail gas prices, not an end in itself.
 
 
 40
 The district court analyzed the efficacy of maintaining independent lessee-dealers in the context of Hawaii's purpose for enacting the Act and found that Act 257 did not substantially advance Hawaii's interest in lower retail gas prices. Relying on the declaration and trial testimony of Dr. Leffler, the court found that Act 257 actually penalizes oil companies for maintaining lessee-dealer stations, stating that in the long term "there will ultimately be fewer lessee-dealer stations than there would be without Act 257" as oil companies decide where and what type of distribution avenues in which to invest. Chevron USA, Inc., 198 F.Supp.2d at 1191.
 
 
 41
 Although the court observed that Act 257 does "preclude[] oil companies from raising rents to levels designed to drive lessee-dealers out of business," id. at 1191, it found that "there is no evidence that, but for Act 257, Chevron or any other oil company would try to drive its lessee-dealers out of business in Hawaii by charging excessive rent." Id. (citing the trial testimony of Dr. Leffler that at the time Act 257 went into effect, Chevron charged relatively low rental prices). Hawaii maintains that this statement indicates that the district court improperly substituted its judgment for that of the legislature on the question whether the legislature's goal in enacting Act 257 was legitimate. Hawaii is correct that the "substantially advances" test reserves its heightened scrutiny for the state's purported means, not its goal. Clearly, the preservation of lessee-dealers was not the legislature's ultimate goal. The court's scrutiny was appropriate.
 
 
 42
 Based on the testimony of the parties' experts, the district court also made findings with respect to two factual questions we directed be resolved on remand — the effect of Act 257 on wholesale prices and the possibility that lessee-dealers will capture a premium. Chevron I, 224 F.3d at 1042. The district court found that the oil companies will offset the impact of Act 257 in part by increasing wholesale prices, which in turn will cause an increase in retail prices. Chevron USA, Inc., 198 F.Supp.2d at 1187-88. On this point, the court was persuaded by the testimony of Dr. Umbeck who testified that oil company pricing involves a search for the optimal balance between various revenue streams; a reduction in rental income, therefore, would necessarily effect how Chevron sets its wholesale prices. Id. The district court discounted the contrary opinion of Dr. Leffler that Act 257 would not cause Chevron to increase wholesale prices because prices were already maximized. Id.
 
 
 43
 Regarding premiums, the court found that Chevron established by a preponderance of the evidence that the reduced rent mandated by the Act will not flow to consumers in the form of reduced retail prices but instead will allow lessee-dealers to capture a premium on their leaseholds. Id. at 1189-90. The parties stipulated that all other factors remaining constant, Act 257 would likely cause the market value of lessee-dealer leaseholds to increase. At trial, moreover, the parties' experts agreed that the lessee-dealers alone would realize any such increase; it would not be passed on to consumers in the form of lower retail prices. Because the court credited Dr. Umbeck's testimony that Chevron's increase in wholesale prices as a result of Act 257 would only partially offset the decrease in its rental income, the court concluded that the remaining amount will inure to lessee-dealers as a premium on the value of their leaseholds. Id. at 1189-90. In so finding, the court adopted Dr. Umbeck's view of the relevant economic market over the view of Dr. Leffler. Id.
 
 
 44
 Based on all the evidence adduced at trial, the district court concluded that Act 257 will not substantially advance a reduction in the retail price of gasoline. The court's factual findings and conclusions of law are consistent with the views of the parties' experts and are not clearly erroneous.
 
 IV
 
 45
 It is argued that our application of the "substantially advances" test to the facts of this case improperly interprets the Supreme Court's decision in Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). The argument maintains that even assuming Yee permits application of the substantially advances test to a rent control ordinance where there is only the possibility of a premium, as this court did in Richardson and Chevron I,[4] the test is inapplicable here where the testimony is that "in all likelihood," a premium will not exist.[5]
 
 
 46
 The argument relies on excerpts from the following colloquy between the court and Chevron's expert, Dr. Umbert, as support for the proposition that there is "probably no premium" created by Act 257:
 
 
 47
 THE WITNESS: [Chevron] would try to raise the wholesale price to recoup as much of the lost rent as they could.... [A]t the stations where they raise the price those stations will have a reduction in volume of gasoline they sell if the dealer raises his retail prices....
 
 
 48
 THE COURT: Then, if the offset is not total, mightn't consumers in deed [sic] benefit from Act 257 because, if the increase in the wholesale price is less than the decrease in rent, then the lessee dealer's overall cost would go down.
 
 
 49
 THE WITNESS: No, no. The dealers overall revenues are going to fall because he's going to be selling gasoline.... [E]ven if the oil company doesn't recover all of the rent reduction, that does not mean the dealer is going to benefit because the whole revenue stream is smaller. In fact, in all likelihood both the dealer would lose and the oil company would lose.
 
 
 50
 . . .
 
 
 51
 The reduction in rent by itself — let's suppose the oil companies do not raise their DTW for a second and they just lower rent to the dealer. There is no reason in our economic theory to believe that the retail prices would fall. That is, the dealer would just pocket the difference.
 
 
 52
 THE COURT: Why is that?
 
 
 53
 . . .
 
 
 54
 THE WITNESS: It's actually an opinion shared by Dr. Leffler and myself and all economics text books. And that is that a fixed commitment to pay dollars each month in the form of rent does not affect the decision on how much gasoline to sell or what price to charge at the retail pump. But, when wholesale price goes up, then the incentive for the dealer to reduce his volume in order to save some of these variable costs will lead him to raise prices.
 
 
 55
 The opinion shared by the experts was not that lessee-dealers will fail to benefit as a result of Act 257; rather, Dr. Umbreck was explaining the widely-held belief that, all things remaining equal, any reduction in rental (fixed) costs realized by the dealers would not be passed on to consumers in the form of reduced retail prices. Hawaii's counsel made this clear during closing argument when he did not deny that lessee-dealers may capture a premium: "While it is true that incumbent dealers could try to charge a premium and a prospective purchaser could agree to pay that premium, ... we do not believe that it will have any impact on the retail price of gasoline simply because the rent gap permits lessee-dealers to stay in business longer, increasing competition and lowering prices."
 
 
 56
 Furthermore, Dr. Umbreck's testimony that "in all likelihood" lessee-dealers will not benefit under Act 257 was based on an uncertain assumption about market behavior. Specifically, that Chevron's increase in wholesale prices and the resulting drop in sales would combine for a loss to lessee-dealers that is greater than the benefit realized by the reduced rent. Neither expert testified that this would necessarily occur. Indeed, in its opinion, the district court stated that "[i]mplicit in Prof. Umbreck's opinion [that Chevron would raise wholesale gasoline prices] is the assumption that Chevron will risk a drop in sales volume in the hope that it will be outweighed by the increase in wholesale price." Chevron U.S.A. Inc., 198 F.Supp.2d at 1189. That same uncertainty about market reaction accounts for the possibility that lessee-dealers will retain a benefit from the reduced rent, i.e., a premium.
 
 AFFIRMED
 
 
 Notes:
 
 
 [1]
 We have on separate occasions recognized two distinct formulations of this first exception. InJeffries v. Wood, we stated that a panel may depart from law of the case if the previous decision "is clearly erroneous and its enforcement would work a manifest injustice." 114 F.3d 1484, 1489 (9th Cir.) (en banc) (emphasis added), cert. denied, 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997). In other cases, including some subsequent to Jeffries, we have stated the test in the disjunctive, allowing departure if the prior decision is clearly erroneous or would work a manifest injustice. See, e.g., Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg. Planning Agency, 216 F.3d 764, 787 n. 3 (9th Cir.2000) (citing cases), aff'd, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). We need not resolve this issue, however, because Hawaii is unable to satisfy either test.
 
 
 [2]
 Hawaii cites to opinions of our sister circuits for the proposition that conclusions of the five-Justice majority inEastern Enterprises are binding statements of law. Although this is true, the conclusion those courts are referring to is that a regulatory takings claim must involve a specific property interest. They do not purport to comment on the continued viability of "substantially advances" takings claims. See, e.g., Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1339 (Fed. Cir.2001) (en banc) ("Thus five justices ... in Eastern Enterprises agreed that regulatory actions requiring the payment of money are not takings."), cert. denied, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); Holland v. Big River Minerals Corp., 181 F.3d 597, 606 (4th Cir.1999) (noting that the five Justices viewed the dispute under Due Process Clause rather than the Takings Clause "because no identifiable property interest was infringed by the legislation"), cert. denied, 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000).
 
 
 [3]
 Because Hawaii's arguments are barred by the law of the case doctrine, we need not address whether the State is also barred by the law of the circuit doctrine and whether, if they are, the latter should supplant the formerSee Jeffries, 114 F.3d at 1511 n. 16 (Kosinski, J., dissenting).
 
 
 [4]
 A concurrence inChevron I argues that our holding that the substantially advances test applies when there exists only the possibility of a premium goes beyond our opinion in Richardson, which relies on Yee. Compare 224 F.3d 1030, 1035, cert denied, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001), with id. at 1042 (W. Fletcher, J., concurring in the judgment).
 
 
 [5]
 Implicit in this argument is the notion that the level of scrutiny we apply to rent control ordinances should be fluid throughout the course of the proceedings. That is, on a motion to dismiss or a motion for summary judgment where factual questions remain regarding the existence of a premium, we should apply the substantially advances test. But the standard we apply after experts have testified on the premium issue should depend upon the substance of that testimony — if there is the possibility of a premium, we should apply the substantially advances test; if not, we should apply the rational basis test. There is not precedent for such an approach
 
 
 W. FLETCHER, Circuit Judge, dissenting:
 
 57
 At issue in this case is the constitutionality of Hawai'i's Act 257, which controls the rent an oil company can charge its dealer/lessees. There are two different constitutional tests that could conceivably apply to Act 257. The first is the "reasonableness" test ordinarily applied to rent and price control statutes. See, e.g., Pennell v. City of San Jose, 485 U.S. 1, 11, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (upholding a rent control ordinance because it was not "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt") (quoting Permian Basin Area Rate Cases, 390 U.S. 747, 769-70, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). The second is the "substantially advances a legitimate state interest" test ordinarily applied to zoning and other land use regulations. See, e.g., Agins v. City of Tiburon, 447 U.S. 255, 261, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (upholding a zoning ordinance because it"substantially advance[d] legitimate governmental goals"); Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).
 
 
 58
 In Richardson v. City and County of Honolulu, 124 F.3d 1150 (9th Cir.1997), we applied the "substantially advances" test to invalidate a rent control ordinance in which the tenant was able to capture a "premium" resulting from the ordinance. In an earlier appeal in this case, Chevron USA, Inc. v. Cayetano (Chevron I), 224 F.3d 1030, 1035 (9th Cir.2000), this panel went beyond Richardson, holding that the "substantially advances" test must be applied to Act 257 because of the "stipulated possibility that [a dealer/lessee] will be able to capture the value of the decreased rent in the form of a premium." That "possibility," in the view of the panel, "separate[d] Act 257 from an ordinary rent control situation" in which the "reasonableness" test would be applied. Id. I disagreed with the majority's analysis in Chevron I, believing that the panel misunderstood Supreme Court case law applicable to rent control and therefore applied the wrong test. Id. at 1042(W. Fletcher, J., concurring in the judgment).
 
 
 59
 In Chevron I, we remanded to the district court to apply the "substantially related" test to Act 257. After a hearing on remand, at which the only evidence presented was the opinion of one expert per side, the district court held that Act 257 did not satisfy the "substantially related" test. It concluded, "Act 257 effects an unconstitutional regulatory taking given its failure to substantially advance any legitimate state interest." Chevron USA, Inc. v. Cayetano, 198 F.Supp.2d 1182, 1193 (D.Haw.2002).
 
 
 60
 If "substantially advances a legitimate state interest" were the proper test to apply to Act 257, I would vote to affirm the district court. The evidence put on by the State's expert in support of Act 257 was sufficiently weak, and the countervailing evidence put on by Chevron's expert was sufficiently strong, that the district court did not err in concluding that this test was not satisfied. My problem is thus not with the manner in which the "substantially advances" test has been applied in this case. Rather, it is with the application of the test in the first place.
 
 
 61
 As I discussed in my concurrence in Chevron I, the only possible basis for the application of the "substantially advances" test to a rent control statute is dictum in Yee v. City of Escondido, 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), in which the Supreme Court upheld a mobile home rent control ordinance against a physical takings challenge. The Court refused to consider whether the ordinance constituted a regulatory taking because that question had not been included in the grant of certiorari, but it briefly distinguished between physical and regulatory takings. It wrote:
 
 
 62
 [T]he effect of the rent control ordinance, coupled with the restrictions on the park owner's freedom to reject new tenants, is to increase significantly the value of the mobile home. This increased value normally benefits only the tenant in possession at the time the rent control is imposed.... Petitioners are correct in citing the existence of this premium as a difference between the alleged effect of the Escondido ordinance and that of an ordinary apartment rent control statute.... [P]etitioners contend that the Escondido ordinance transfers wealth only to the incumbent mobile home owner. This effect might have some bearing on whether the ordinance causes a regulatory taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance. See Nollan v. California Coastal Comm'n [, 483 U.S. 825, 834-35, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)]. But it has nothing to do with whether the ordinance causes a physical taking.
 
 
 63
 Id. at 530, 112 S.Ct. 1522.
 
 
 64
 It is undisputed that Chevron has the capacity to increase the wholesale price of gasoline to its dealer/lessees who benefit from rent control under Act 257. Chevron's expert testified that "in all likelihood" the combined consequences of Act 257 would be an economic loss for the dealer/lessees and an increase in wholesale gasoline prices:
 
 
 65
 Question [by the court]: Then why wouldn't Chevron raise the wholesale price for those stations to completely offset the rent reductions?
 
 
 66
 Answer [by Dr. Umbeck]: Well, they would certainly try.... [T]hey would try to raise the wholesale price to recoup as much of the lost rent as they could, and the law of demand operating at each of those individual stations, however, is going to limit the total amount they're able to recoup. In other words, at the stations where they raise the price those stations will have a reduction in the volume of gasoline they sell if the dealer raises his retail prices, which logically he would.... At the individual stations that are affected there's going to be less revenue generated in total from gasoline sales because they're going to lose some customers. And so, even if the oil company doesn't recover all of the rent reduction, that does not mean the dealer is going to benefit because the whole revenue stream is smaller. In fact, in all likelihood both the dealer would lose and the oil company would lose.
 
 
 67
 (Emphasis added.)
 
 
 68
 As the challenger of Act 257, Chevron had an obvious interest in establishing that Act 257 would create a premium for its dealer/lessees since this would suggest that the statute is unconstitutional. Yet Chevron's own expert testified that "in all likelihood" a dealer would lose money. In other words, according to Chevron's own expert, there is probably no premium created by Act 257. Far from gaining a premium,"in all likelihood" the dealer/lessees will lose money as a result of Act 257.
 
 
 69
 It is a long way from the quoted passage in Yee to the panel's holding in this case. The Court in Yee did not say, even in a case where there was an actual premium, that the Nollan "substantially advances" test would apply. Nor did the Court say that the "substantially advances" test would apply in a case where there was only the probability of a premium, instead of an actual premium. But even if the Court meant in Yee what it did not say, this case is a far cry from Yee. Here, the premium is not actual, nor even a mere probability. Rather, "[i]n all likelihood," the premium does not exist.
 
 
 70
 We took a wrong turn in Richardson, we continued on the wrong path in Chevron I, and we are now in the wrong place. Under the panel's holding, "virtually all rent control laws in the Ninth Circuit are now subject to the `substantially advances a legitimate state interest' test[,]" 224 F.3d at 1048 (W. Fletcher, J., concurring in the judgment), and many of those laws may well be held unconstitutional under that test. Rent control is often inefficient and sometimes unfair. See id. But we should not confuse inefficiency and unfairness with unconstitutionality.
 
 
 71
 I respectfully dissent.